AMOCO PRODUCTION COMPANY, Amoco Oil Company and Gulf Oil Corporation, Exxon Corporation, Sun Oil Company and Atlantic Richfield Company, Mobil Oil Corporation and Mobil Oil Exploration & Producing Southeast, Inc., Shell Oil Company, Continental Oil Company, InterNorth, Inc., Northern Gas Products Company, Northern Propane Gas Company and UPG, Inc., Aminoil, USA, Inc., Texgas Corporation and Allied Chemical Corporation, Plaintiffs,

v.

DEPARTMENT OF ENERGY et al., Defendants.

Civ. A. Nos. 78–463, 78–466, 78–471, 78–519, 79–47, 78–464, 78–530 and 79–194.

United States District Court,
D. Delaware.

April 9, 1981.

William O. LaMotte, III, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Charles E. Cheek, Tulsa, Okl., Robert W. Fuller, Houston, Tex., Charles C. Hairston, Tulsa, Okl., Robert F. Ochs, Houston, Tex., The Gulf Companies, Tulsa, Okl., for Gulf.

R. Bruce McLean, Daniel Joseph, Harry R. Silver, Joseph T. Casey, Jr., Akin, Gump, Hauer & Feld, Washington, D. C., Charles S. Lindberg, Fairfax, Va., Donald E. Marquardt, Gail F. Schulz, Mark J. Forsch, Mobil Oil Corp., New York City, E. S. McCrum,

Mobil Oil Exploration & Producing Southeast, Inc., New Orleans, La., for Mobil.

Thomas Herlihy, III, Herlihy & Herlihy, Wilmington, Del., M. W. Parse, Jr., Jerry E. Smith, Reagan W. Simpson, Fulbright & Jaworski, Barbara Finney, Edward de la Garza, Houston, Tex., for Exxon.

David L. Roll, Samuel T. Perkins, Seth Goldberg, Steptoe & Johnson, Washington, D. C., Richard C. Morse, Atlantic Richfield Co., Los Angeles, Cal., Kenneth R. Dickerson, Atlantic Richfield Co., Dallas, Tex., for Atlantic Richfield.

Charles S. Crompton, Jr., Potter, Anderson & Corroon, Wilmington, Del., Donald B. Craven, Robert K. Huffman, James B. Altman, Miller & Chevalier, Washington, D. C., David M. Francis, Mona A. Yoes, Conoco Inc., Houston, Tex., for Conoco.

Charles F. Richards, Jr., Richards, Layton & Finger, Wilmington, Del., William Simon, William E. Wickens, Frederick S. Frei, Joanne Parsons, Howrey & Simon, Washington, D. C., William G. Riddoch, Shell Oil Co., Houston, Tex., for Shell.

Stephen E. Herrmann, Richards, Layton & Finger, Wilmington, Del., Kenneth L. Bachman, Jr., Henry J. Plog, Jr., Eugene M. Goott, Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., Robert A. Bussian, Gerard J. Swonke, Aminoil USA, Inc., Houston, Tex., John R. Cope, Arthur M. Meyer, Jr., Thomas F. Holt, Jr., Bracewell & Patterson, Washington, D. C., for Aminoil.

Richard G. Morgan, Donald S. Arbour, Martha Priddy Patterson, O'Connor & Hannan, Washington, D. C., Dean Wallace, Frank J. Duffy, Michael P. Moran, InterNorth, Inc., Omaha, Neb., for InterNorth.

Bruce M. Stargatt, Jack B. Jacobs, Young, Conaway, Stargatt & Taylor, Wilmington, Del., James V. Carroll, III, Edith H. Jones, Bruce R. Coulombe, Andrews, Kurth, Cambell & Jones, Timothy T. West, Allied Chemical Corp., Houston, Tex., for Texgas and Allied Chemical.

James W. Garvin, Jr., U. S. Atty., John X. Denney, Jr., Asst. U. S. Atty., Wilmington, Del., Don W. Crockett, Robert Wehrle-Einhorn, Ellen P. Spangler, Courtney M. Price,

L. Lamont Bossard, Jr., U. S. Dept. of Energy, Alice Daniel, Asst. Atty. Gen., C. Max Vassanelli, Dina R. Lassow, Stephen E. Hart, U. S. Dept. of Justice, Washington, D. C., for defendants.

## OPINION

STAPLETON, District Judge:

These preenforcement review actions against the Department of Energy and related defendants (collectively "DOE") challenge that agency's current interpretation of certain regulations pertaining to the pricing of natural gas liquids ("NGLs") and natural gas liquid products ("NGLPs"). There are two distinct categories of plaintiffs: integrated processors of NGLs and NGLPs which do not refine crude oil ("processor-marketers") and integrated processors of NGLs and NGLPs which also refine crude ("processor-refiners"). All plaintiffs have moved for summary judgment. While the issues posed by the motions of the processor-marketers and the motions of the processor-refiners are distinct, they are sufficiently related to be efficiently discussed in a single opinion.

The background of these controversies is set forth in *Northern Natural Gas v. U. S. Department of Energy*, 464 F.Supp. 1145 (D.Del.1979) and *Amoco Production Co. v. United States Department of Energy*, 469 F.Supp. 236 (D.Del.1979). The following discussion will assume familiarity with that background and focus on those facts of particular significance in the context of the issues posed by the pending motions. Those issues are:

1. Under Subpart K of the Mandatory Petroleum Pricing Regulations, 10 C.F.R. § 212.161, *et seq.*, as promulgated in December of 1974,[1] was a transfer from a process-ing entity to its affiliated marketing entity a "first sale"?

2. Under Subpart K, as promulgated in December of 1974, was a transfer from a processing entity to its affiliated refining entity a "first sale"?

3. If these transfers between affiliates were not "first sales" under the original Subpart K, were those regulations invalid in that respect by virtue of the failure of the issuing agency to follow the applicable procedural requirements?

4. Whatever may have been the status of a transfer between such affiliated entities prior to November 1, 1978, were such transfers "first sales" after the 1978 amendments to Subpart K which became effective on that date?

## THE INDUSTRY

NGLs are a liquified hydrocarbon mixture extracted from "wet" gas (a term that describes natural gas in which NGLs are suspended) at gas plants by means of refrigeration, absorption and adsorption processes. Raw NGLs are primarily composed of propane, butanes, natural gasolines and ethanes, in mixtures. After extraction from wet natural gas, NGLs may be fractionated to produce segregated NGLPs[2] (i. e., propane, butane, natural gasoline and ethane).[3] Many gas processors have fractionation facilities for the production of NGLPs as well as refrigeration, absorption and adsorption facilities for the extraction of NGLs.

Gas processors have traditionally obtained the wet gas from which they extract NGLs and NGLPs pursuant to "net-back" arrangements with the producers or royalty owners of the wet gas. Under such an arrangement, the producer or royalty owner

---

1. When Subpart K was originally promulgated, its provisions were numbered from § 212.141 to § 212.150. Unless otherwise noted, references in this Opinion are to the regulations as renumbered on February 4, 1975 (i. e., from § 212.161 to § 212.170). 40 Fed.Reg. 6200 (February 10, 1975).

2. Propane and butane can also be refined from crude oil.

3. Ethane has never been subject to the Mandatory Petroleum Price Regulations. *See* § 3 of the Emergency Petroleum Allocation Act, 15 U.S.C. § 752. Butane and natural gasoline were decontrolled effective January 1, 1980. 44 Fed.Reg. 70118 (December 6, 1979).

is compensated for the removal of the liquids portion of his stream by receiving a percentage of the value of the NGLs or NGLPs produced from the stream. After the extraction of NGLs from wet gas, the wet gas becomes "dry" or "residue" gas and is generally sold by the producer to natural gas transmission companies.

After the processing operation, gas processors generally sell propane to marketers who resell to end users for commercial and residential use. Butane, natural gasoline and ethane are often sold for use as refinery or petrochemical blendstocks and feedstocks.

The plaintiffs in three of the cases now before this Court[4] are gas processors affiliated with separately incorporated marketers. These marketers purchase NGLs and NGLPs from their affiliated processors and from other processors, and resell those NGLs and NGLPs at wholesale and at retail. Neither Aminoil nor Northern nor any other entity directly or indirectly related to either company engages in crude oil refining.

The other significant type of integrated company which engages in gas plant operations is the processor-refiner, i. e., a crude oil refiner that also operates gas processing plants and, generally, also has extensive marketing operations.[5] To a crude refiner, NGLs are raw materials similar to the crude oil itself. Together, processor-marketers and processor-refiners extract and sell more than three-fourths of the NGLs and NGLPs produced in gas plants in the United States.

The third and final segment of the gas processing industry consists of "unaffiliated processors". These are firms which operate natural gas processing plants, do not refine crude oil, and do not have marketing affiliates or extensive marketing operations for the sale of their NGLs and NGLPs. These firms typically sell their NGLs and NGLPs at the outlet or "tailgate" of their gas plants to marketers which perform the same functions as the marketing affiliates of processor-marketers.

## THE INITIAL PETROLEUM PRICE REGULATIONS

On August 19, 1973, the Cost of Living Council promulgated its Phase IV price regulations for the petroleum industry. 38 Fed.Reg. 22536 (August 22, 1973). The basic approach of these regulations was to allow companies to charge May 15, 1973 prices adjusted to reflect dollar-for-dollar increases in product (i. e., raw material) and non-product (i. e., operating) costs incurred since May 1973. These regulations govern, *inter alia*, the prices which could be charged by "refiners" in sales of "covered" products and were ultimately construed to apply to sales of NGLs and NGLPs by gas processors to marketers.[6]

There are two aspects of the regulations in effect during 1973 and 1974 (and continuing to the present) which are relevant to the present controversy. First, these regulations provided for use of transfer prices between affiliated entities in computing the cost of raw materials, including transfer prices in connection with first sales of domestic crude oil from a producer to an affiliated refiner as well as for imported crude oil and covered products other than crude oil. 10 C.F.R. §§ 212.83(b), 212.83(e).[7] These transfer prices were all to be recognized by the affiliated refiner as product costs which, along with the cost of crude oil and other products purchased from unaffiliated third parties, were to be used in determining increased product costs available for recovery through increases in prices of re-

---

4. Civil Actions Nos. 78–464, 78–530 and 79–194.

5. The plaintiffs in the following civil actions are processor-refiners. Civil Actions Nos. 78–463, 78–466, 78–471, 78–519 and 79–47. The plaintiffs in Civil Action No. 79–194 were processor-refiners prior to February 1, 1979.

6. *See National Helium Corp. v. FEA*, 569 F.2d 1137 (Em.App.1977); *Mobil Oil Corp. v. FEA*, 566 F.2d 87 (Em.App.1977).

7. Now Sections 212.82 (definition of "transactions between affiliated entities") and 212.-83(b), respectively.

fined products. The definition of "cost of crude petroleum" in the context of the required calculation of increased product costs, included the "cost of . . . natural gas liquids which are used in refining and are further refined." [8]

Second, in August 1974, the FEA amended its "Special Propane Rule," which was initially designed to restrict the prices which could be charged for propane refined from crude oil. 10 C.F.R. § 212.83(c)(1)(iii).[9] The preamble to that "Emergency Amendment" stated, *inter alia*:

> The emergency special propane rule further provides that no increased costs can be calculated by refiners for domestic gas liquids or propane which are acquired from an affiliated entity.... The FEA is aware of the need for improving its regulations in this area and will be proposing amendments for this purpose in the immediate future.

To accomplish this objective, the Emergency Amendment purported to modify the effect of Section 212.83(e), the section which expressly sanctioned transfer pricing:

> . . . Notwithstanding § 212.83(e), no increased cost of natural gas liquids or propane may be calculated with respect to domestic natural gas liquids and propane which are obtained from affiliated entities....[10]

Thus, before the Emergency Amendment, transfer pricing of NGLs had been permitted; with the amendment, the FEA attempted to prohibit that practice as to NGLs and propane except in certain specific situations.[11]

Thus, it is clear that recognition of transfers between affiliated entities for purposes of computing increased costs was an integral part of the applicable regulations during 1973 and 1974.

## THE SUBPART K PROPOSAL

On September 6, 1974, only one month after the promulgation of the Emergency Amendment to the Special Propane Rule, the FEA proposed a new Subpart K designed specifically for the gas processing industry. 39 Fed.Reg. 32718 (September 10, 1974). The proposed regulations

> applie[d] to the first sale of natural gas liquids by a producer or royalty owner, and to all sales, including any first sale, by a gas plant operator. All other sales of natural gas liquids are subject to the price regulations of Subpart E and F of [Part 212].

*Id.* at 32730 (proposed § 212.161).

The proposal of this new Subpart K reflected the FEA's special concern about the impact upon gas processors of the May 15, 1973 base date established by the general petroleum price regulations. Prices for NGLs and NGLPs are subject to wide seasonal fluctuations and were atypically low on the base date for some processors. Because the availability of wet streams for processing historically had been sensitive to price, the FEA recognized the need to stimulate the continued production of NGLs and NGLPs by establishing higher May 15, 1973 incentive prices. In the preamble, the FEA found that May 15, 1973 prices for propane at the gas plant and refinery level averaged approximately 7 cents per gallon, whereas prices of 11 cents to 13 cents per gallon at that level were necessary to ensure continued production of propane from natural gas. The FEA found that a price of 15 cents per gallon would be necessary to stimulate additional production. *Id.* at 32719.

The FEA proposed to provide this production incentive in the form of an incentive increment which would be added to the actual May 15, 1973 first sale prices (which

---

**8.** 38 Fed.Reg. 33577, 33579 (December 6, 1973).

**9.** Now § 212.83(e)(1)(ii)(F).

**10.** *Id.* at 28609.

**11.** Transfer pricing did continue in some situations. The exceptions to the general rule of the Emergency Amendment were purchases from

affiliated entities which had been permitted to charge higher prices "by virtue of exceptions granted or prenotified price increases" which had been approved, or purchases from affiliated entities "that have a higher lawful price than entities from which such purchases were made in May, 1973...." *Id.* at 28608.

the FEA had found to be too low to ensure continued production of NGLs and NGLPs). The FEA stated that "[t]he amount of the increment that may be needed appears to be in the range of 3 cents to 5 cents per gallon." *Id.* The precise amount of this incentive first sale increment was to be determined on the basis of public comments on the rulemaking proposal.

The FEA was also concerned about the "disruptive effects [from which] the distribution sector of the propane industry" was suffering. *Id.* At that time, distributors which had to purchase propane from processor-refiners were at a significant competitive disadvantage as compared to other distributors which had access 'to propane sold by independent processors and processor-marketers, which was frozen at artificially low prices.[12] The prospect of reducing or eliminating this cost disparity faced by distributors was another reason given by FEA for its proposal to allow an increment to May 15, 1973 prices "at the first sale level." *Id.*

The FEA noted that such an increment "would be comparable to the $1.35 per barrel increase permitted to the May 15, 1973 prices for domestic crude oil . . . ." *Id.* This increment to May 15, 1973 domestic crude oil prices was established in December 1973 to replace the previous 35 cent per barrel increment. 38 Fed.Reg. 34985 (December 21, 1973). The increment was to be used in transfers of crude oil between affiliated entities as well as to third party sales and was expressly intended to provide additional incentives for crude oil production, exploration and the development of other energy sources.

However, the FEA faced "a complicating factor" when it wished to propose a similar incentive for NGL production in September 1974 because, unlike crude oil, wet gas was not normally sold or transferred by the producer to the gas processor at a specific price per unit of volume. Instead, the FEA noted, producers either retained title to the NGLs and NGLPs after extraction or received a fee based on a percentage of the market value of the NGLs and NGLPs or of the sales revenue received for those products (a net-back sale). Accordingly, FEA proposed to provide an incentive increment at the first sale level, where a specified price per unit volume of NGLs or NGLPs was received by the seller, instead of at the prior net-back sale level.

For present purposes, the single most important part of the September proposal was the following statement in the preamble

> The special regulations being proposed in this notice for gas plants will also apply to gas plants owned or controlled by refiners, for purposes of determining the appropriate transfer price to the refiner. . . . The "special propane rule" . . . is proposed to be kept in effect for refiners, except to the extent that the proposed new natural gas liquids price regulations would determine the transfer prices to refiners from affiliated gas plants.

39 Fed.Reg. 32720 (September 10, 1974). Thus, it is clear that the September 1974 proposal was intended to authorize transfer pricing between affiliated entities and to provide that the transfer prices would be "determined" by the incentive pricing regulations.[13]

The FEA held a public hearing on the proposed Subpart K provisions on September 30 and October 1, 1974, and received written comments both before and after these dates. Neither at the hearing nor in any of the written comments did any party question the FEA's proposal to recognize

---

**12.** Processor-refiners, while subject to the same regulations, could nevertheless pass through their increased crude oil costs in the prices charged for their NGLs and NGLPs under Subpart E. *Id.*

**13.** After conceding this point on at least two prior occasions (i. e. once in this litigation and once in Interpretation No. 78–92 issued to Continental Oil on July 10, 1978), the DOE now

suggests that while the 1974 proposal contemplated transfer pricing, it need not be read as allowing the proposed price adjustments in determining transfer prices. This is an untenable position. The preamble is clear on its face that "the proposed new natural gas liquid price regulations" of Subpart K would be utilized in determining the transfer price.

transfers between affiliated entities as first sales.

## THE FINAL SUBPART K REGULATIONS

On December 19, 1974, the FEA issued the Subpart K regulations in final form, effective January 1, 1975. 39 Fed.Reg. 44407 (December 24, 1974). The regulations were expressly made applicable

to all sales of natural gas liquids and natural gas liquid products, including transfers between affiliated entities, by all firms, including gas plant operators, producers of natural gas, natural gas royalty owners, and refiners except sales by resellers or retailers, which are subject to Subpart F of [Part 212].

§ 212.161(a). "Gas plant operators" which did not also refine crude oil were to determine their maximum lawful prices under the new Subpart K. § 212.161(b)(1). Processor-refiners were to determine their May 15, 1973 selling prices and increased gas plant-related costs under Subpart K. § 212.161(b)(2).

As the FEA had proposed, the final regulations provided for an incentive adjustment to May 15, 1973 first sale prices. However, instead of the cent-per-gallon increment which the FEA had proposed to allow each gas processor to add to its own May 15, 1973 first sale price, the FEA decided to establish fixed "adjusted May 15, 1973 first sale prices." These prices would serve as "floor" prices to be used by processors instead of their actual May 15, 1973 first sale prices, if their actual prices on that date had been lower. These "adjusted" first sale prices were established at 8.5 cents per gallon for propane, 9 cents per gallon for butane, and 10 cents per gallon for natural gasoline. The FEA also established even higher "imputed" May 15, 1973 first sale prices of 12, 12.5 and 13.5 cents per gallon, respectively, for propane, butane and natural gasoline derived from newly-constructed gas plants. § 212.164(c). These prices were intended to serve as an incentive for construction of additional processing facilities. 39 Fed.Reg. at 44410–11.

The FEA recognized, however, that some processors might have had actual May 15, 1973 prices that were higher than the adjusted first sale prices. Accordingly, these processors would be allowed to use their actual May 15, 1973 first sale price. *Id.* at 44409. This decision to make optional the use of adjusted first sale prices was designed to

help insure that all processors of natural gas will have margins comparable to historical levels—thus providing a continuing incentive to produce natural gas liquid products.

*Id.*

As in the September proposal, the FEA again described the provision for an adjusted first sale price as analogous to the Subpart D crude oil regulations, which established an incentive price to be applied in sales to third parties and in transfers between affiliated entities:

Permitting the use of this adjusted May 15, 1973 "free market" price for propane is analogous to the crude oil ceiling price regulation, which does not limit each producer of crude oil to a price based on the price actually charged by that producer in sales of its crude oil on May 15, 1973. Rather, producers' prices for domestic crude oil are based on the highest posted price * * * [on] May 15, 1973, for that grade of crude petroleum at that field * * *

10 C.F.R. § 212.73(b). *Id.* (Brackets and omissions in original). The FEA expressly stated that it was attempting to "ensure, to the maximum extent practicable, . . . that established relationships and operations in the industry are not unnecessarily disrupted." *Id.*

## THE 1977–1978 RULEMAKING

After the final Subpart K regulations had been in effect for a number of months, questions began to be raised by certain FEA auditors as to the manner in which the regulations were to be applied to the operations of integrated companies. Accordingly, plaintiff InterNorth filed a request for interpretation in February 1976 and Mapco,

Inc., another processor-marketer, filed a similar request in December 1976. In these requests, InterNorth and Mapco requested confirmation (1) that their transfer sales from their gas plants to their affiliated marketing entities constituted "first sales" under Subpart K, so that the Subpart K adjusted May 15, 1973 first sale prices could be used in computing those transfer prices, and (2) that the maximum lawful price for resales by their marketing affiliates was to be determined pursuant to Subpart F, relating to resellers and retailers, rather than Subpart K.

On June 3, 1977, the FEA proposed certain amendments to Subpart K. 42 Fed. Reg. 29490 (June 9, 1977). In addition to a number of amendments not directly related to the issues in this case, the FEA proposed "to clarify the application of Subpart K to the marketing operations of gas processors." Recognizing that "[p]resent Subpart K does not expressly treat the subject of increased marketing costs," the FEA tentatively concluded that "Subpart K should be amended to make clear that it does govern the marketing operations of gas processors that do not refine crude oil, regardless of whether such marketing operations are conducted directly or through corporate entities." Id. at 29496. Accordingly, the FEA proposed to add, for the first time, a provision defining the term "firm" to include a parent and its affiliated entities for purposes of Subpart K. Id. at 29496, 29508. The FEA also proposed to add a provision for the recovery of increased marketing costs under Subpart K. Id. at 29496, 29510. However, this proposal was expressly stated to be only "a matter of prospective policy and without prejudice to the proper resolution of this issue under the current regulations," a question to which the FEA stated that it was "giving careful study." Id. at 29496.

On September 14, 1978, the DOE issued final amendments to Subpart K, effective November 1, 1978. 43 Fed.Reg. 42984 (September 21, 1978). These amendments added a definition of "firm" and added market-

ing cost recovery provisions similar to those proposed. The amendments also deleted from § 212.161(a) the phrase "including transfers between affiliated entities," even though no such deletion had been proposed. The rulemaking notice announced for the first time, almost four years after Subpart K was promulgated, the DOE's position that these changes were merely "a construction of the regulations as they then existed." Id. at 42996. Specifically, according to the DOE: (1) the processor-marketers' transfer had no regulatory pricing significance, (2) the Subpart K "first sale" did not occur until the affiliated marketer made a sale to an unrelated third party, and (3) the processor-marketer was a single firm, controlled exclusively by Subpart K, and thus was not entitled to recover its increased marketing costs under Subpart F. Id. at 42995–96.

On October 30, 1978, the DOE issued a still-continuing "suspension" of the deletion of the phrase "including transfers between affiliated entities" from Subpart K, and announced that it was studying a possible prospective adoption of transfer pricing. 43 Fed.Reg. 50842 (October 31, 1978).

InterNorth filed its action in this Court on October 20, 1978. On December 13, 1978 the DOE issued Interpretation 1978–63 to InterNorth and Mapco, 44 Fed.Reg. 3023 (January 15, 1979). The InterNorth/Mapco interpretation restated the position on Subpart K transfer pricing which the DOE had announced in its preamble to the 1978 Subpart K amendments.

## THE PROPRIETY OF SUMMARY ADJUDICATION

There is a threshold issue. The DOE has filed a "Memorandum Setting Forth Disputed Issues of Material Fact in Plaintiffs' Motion for Summary Judgment." This Memorandum comments on several categories of contemporaneous construction evidence which have been submitted by the plaintiffs.[14] The DOE's initial position is that this evidence is not competent and should not be considered by the Court. Its

---

14. In addition to the FEA publications hereafter discussed, this "contemporaneous construc-

tion" evidence consisted primarily of the affidavits of G. Stewart Stone and Ottie T. Vipper-

fall-back position is that the DOE has filed counter-affidavits disputing much of this evidence and all of the inferences which the plaintiffs draw from it and that this conflict forecloses summary judgment.

I find it unnecessary to comment on the issues discussed in the DOE's Memorandum because I do not regard those issues as being material in the present context. The plaintiffs' contemporary construction evidence was submitted in anticipation of an argument on the part of the DOE that its interpretation of Subpart K should be given great deference by this Court. Plaintiffs' submission was intended to show that the agency's current construction of Subpart K as it pertains to interaffiliate transfers was not a *consistent, contemporary* construction. As will be discussed hereafter, the FEA concededly issued several publications which demonstrate this point, and consequently, plaintiffs' other contemporary construction evidence may simply be disregarded. These FEA publications tell the industry that Subpart K and its first sale provisions apply to interaffiliate transfers. Needless to say, the introduction of trial evidence by the DOE tending to show that some agency personnel thought otherwise during the period when Subpart K was originally being promulgated and enforced, would not undermine the conclusion that the agency's current view was not a consistently articulated one during that period. Because the presence or absence of a consistent contemporary construction is the only issue in this area which I find to be material, it follows that summary judgment is not inappropriate. Accordingly, I now turn to the substantive issues presented by plaintiffs' motion for summary judgment.

### TRANSFERS TO AFFILIATED MARKETERS UNDER THE ORIGINAL SUBPART K

■ The text of the original Subpart K, the history of its development, and the de-

clared objectives of the agency in promulgating it permit only one conclusion: transfers from gas processors to their affiliated marketers were intended to qualify as "first sales" and were, therefore, eligible for the adjusted first sale prices.

As originally enacted, Subpart K began as follows:

(a) *Scope.* This subpart applies to all sales of natural gas liquids and natural gas liquid products, including transfers between affiliated entities, by all firms, including gas plant operators, producers of natural gas, natural gas royalty owners, and refiners except sales by resellers or retailers, which are subject to Subpart F of this part.

(b) *Relationship to other Subparts*—(1) *Gas plant operators.* Refiners that only refine liquid hydrocarbons from oil and gas field gases and do not refine crude petroleum shall determine their maximum lawful prices pursuant to this Subpart K and are not also subject to Subpart E.

Thus, gas plant operators, which did not refine crude, were directed, in conjunction with "all sales" of NGLs and NGLPs "including transfers between affiliated entities," to determine "their maximum lawful prices" pursuant to Subpart K. Section 212.163 set forth what those maximum lawful prices would be in a "first sale" and a "net-back sale", and Section 212.164 authorized the use of the "adjusted and imputed" May 15, 1973 first sale prices in determining the maximum lawful price in a first sale. Finally, the definition section, Section 212.-162, provided that " 'first sale' means ... the first transfer for value to a class of purchaser for which a fixed price per unit of volume is determined."

A transfer from a processing entity to its affiliated marketing entity falls within the

man, former employees of the FEA. When the Subpart K rulemaking proceeding was in progress, Mr. Stone was an attorney at the FEA having responsibility in connection with the initial drafting of the final Subpart K regulations and Mr. Vipperman was Director of

Price and Allocation Policy for the FEA. Among other things, these affidavits state that no decision was made by the agency to abandon the first sale, transfer pricing approach suggested in the September 1974 proposal.

scope of the first sale definition—it is the first "transfer for value" (i. e. a transfer for an interaffiliate payment from the marketing entity to the processor) [15] "to a class of purchaser" (i. e. a class consisting of or including the marketing affiliate) "for which a fixed price per unit of value is determined" (i. e. the transfer price, which is a cents per gallon price.[16] Moreover, there is no way to accord any meaning to the express reference to interaffiliate transfers in Section 212.161(a) other than to take literally the command that processors will use Subpart K to determine maximum lawful prices on transfers between affiliated entities, and, clearly, if the maximum selling price for such transfers is to be determined under Subpart K, the only alternative is "first sale" and "adjusted first sale price" treatment.

The DOE has advanced no theory as to how the command of Section 212.161 with respect to gas processor transfers to affiliating marketing entities might be read in a manner consistent with its contention that no Subpart K first sales can occur until there is a transfer to an unaffiliated third party. The agency's present statutory construction argument is that the provisions of Section 212.161(b)(2), dealing with processor-refiner costs, are inconsistent with a literal reading of the express reference to Subpart K's application to "transfers between affiliated entities" and that, accordingly, this language must be liberally read as intending to allow for "the transfer of

costs calculated by affiliated gas processing entities under Subpart K to the relevant cost pool of the refiner's cost allocation formula under Subpart E." [17]

The application of Subpart K in the context of processor-refiners will be discussed hereafter. Whatever may be the merit of this argument in the context of processor-refiners, it clearly cannot carry the day in the processor-marketer cases. The language on which this argument is founded is not applicable to processor-marketers and it would be absurd to attribute to the DOE an intention that processor-marketers should ignore the express command of those portions applicable to them on the basis of language which they would have no reason to consult. More fundamentally, however, the DOE's position is that transfer sales and prices are unrecognized and unregulated by Subpart K. All of the arguments which the DOE has advanced from time to time in this litigation boil down to an assertion that Subpart K "*applies* to all sales . . ., including transfers between affiliated entities" by *not* applying to those transfers.

A much less strained interpretation is offered by the FEA in 1976 in a publicly distributed FEA handbook called Pricing Guide for Natural Gas Processors. In this handbook a message from then-Administrator Frank Zarb states that it is intended to "assist natural gas processors in understanding and complying with FEA regulations on the pricing of natural gas liquids

---

**15.** On the same day on which the Subpart K regulations were issued, the FEA also issued a ruling regarding the allocation of increased costs by refiners in which it explicitly included "transfers by refiners to affiliated entities . . . as one of several types of "transactions·[which] constitute transfers for value." The ruling stated:

Just as the FEA permits "transactions between affiliated entities" to be used as a basis for determining costs (e. g., § 212.83(b), and § 212.83(f), FEA requires that the economic significance of transactions between affiliated entities be taken into account when determining recovery of increased costs in sales of covered products.

Ruling 1974–27 ("Allocation of Refiner's Increased Product Costs to Sales Volumes"); 39 Fed.Reg. 44415 (December 24, 1974).

**16.** While the DOE's brief does not refer directly to the "first sale" definition, it does contend that the phrase "class of purchaser" as used in Section 212.163(a) is a "term of art" which excludes affiliated entities. I perceive no basis for so holding. To the contrary, the very same phrase was utilized in the first sale definition included in the regulations proposed in September of 1974 which recognized interaffiliate transfers as first sales. Moreover, I understand the DOE to concede that some transfers to affiliated entities (i. e. those to marketers which qualify under the 5% rule of Subpart F) are first sales under Subpart K.

**17.** Defendants' brief in InterNorth and Aminoil cases, p. 36.

(NGLs) and NGL products." The very first sentence of the body of the handbook, which "reflects regulations in effect as of September 30, 1976," states:

> The pricing regulations outlined in part 212, Subpart K apply to any firm involved in the *first sale* of natural gas liquid and natural gas liquid products, *including transfers between affiliated entities*. (Emphasis supplied)

In other words, a "transfer between affiliated entities" can be a "first sale" under Subpart K.[18]

Even if there were some ambiguity in the provisions of Subpart K dealing with processor-marketers, however, a review of the administrative proceedings which resulted in their promulgation would eliminate any uncertainty. As already noted, the preamble of the September 1974 proposed regulations expressly stated that they provided for the recognition of transfers between affiliated entities as "first sales". *See* 39 Fed.Reg. at 32720.[19] The DOE is, accordingly, compelled to contend that FEA reversed its position on this question prior to issuing the final regulations in December of 1974. This position is, however, untenable.

The DOE's contention is contradicted not only by the presence of the term "including transfers between affiliated entities" in the "scope" provision of the final regulations, but also by the fact that this phrase was *not* included in the proposed regulations. If the FEA in fact changed its mind after issuing the September proposal and decided not to recognize transfer sales in the final

version of Subpart K, why did the agency at the same time add a *new* provision expressly making those final regulations applicable to interaffiliate transfers. It is simply inconceivable to me that such a phrase would have been added in connection with revisions to the proposed regulations intended to eliminate recognition of transfer sales.

A comparison of the proposed and final definitions of the term "first sale" is similarly revealing. The proposed definition of "first sale", which was explicitly intended to include interaffiliate transfers, was:

> With respect to natural gas liquids, the first transfer for value to a class of purchaser by the producer, royalty owner, or gas plant operator *for which the seller receives a price per unit of volume* with respect to natural gas liquids.

39 Fed.Reg. at 32730 (proposed Section 212.-142) (emphasis added). In the final regulations, the first sale definition was amended slightly to read:

> With respect to natural gas liquids or natural gas liquid products, the first transfer for value to a class of purchaser *for which a fixed price per unit of volume is determined.*

Section 212.162 (emphasis added). It will be noted that in the final regulation it was no longer required that a "price" be actually "received"; it was sufficient if a price per unit were "determined". It would be incongruous to assume that an agency intending to communicate a change in policy from the recognition of transfer pricing to

---

**18.** The agency's *Manual for NGL Audits* (DOE Document 375), a 1975 publication, states in similarly unambiguous terms that:

> As described in prior chapters, FEA now utilizes the concepts promulgated in Subpart K, § 212 of the Price Regulations for governing the sales of natural gas liquids and the related products fractionated therefrom. *Subpart K concepts also are applicable to (1) transfers for value between all firms inclusive of transfers between affiliated entities*, (2) gas plant operators, (3) producers of natural gas, (4) natural gas royalty owners, and (5) refiners.

(Emphasis added) A May 1976 Compliance Guide for NGL Processors (Gov.Doc. No. 635) similarly advises:

> The pricing regulations outlined in Part 212, Subpart K, apply to any firm involved in the *first sale* of natural gas liquids and natural gas liquid products, *including transfers between affiliated companies. . . .*

(Emphasis added)

**19.** The DOE's brief contends that the 1974 proposal proposed first sale treatment only for processor-refiners' interaffilliate transfers. If this be true, it is nevertheless irrelevant. Section 212.161(a), as adopted, simply cannot be read to say that Subpart K governs interaffiliate first sales of processor-refiners, but not those of processor-marketers.

its non-recognition would amend the first sale definition to make it more compatible with transfer pricing.

These portions of the administrative record militate against the conclusion that the FEA made a 180 degree turn during the rulemaking process. Of equal importance, however, is the fact that the administrative record and the supplementary record developed in these cases is wholly barren of documents which suggest that such a turn was taken. As the FEA recognized on another occasion, a change of this character would have had a major impact on the industry and common sense indicates that such an about face would not have occurred without some documentation in the agency's files.

The conclusion urged by the processor-marketers is also supported by the FEA's actions with respect to the emergency amendment to the special propane rule. It will be recalled that the emergency amendment prohibited most transfer pricing of NGLs and propane and that the September proposal was to rescind that amendment. The prohibitions on transfer pricing were in fact deleted in amendments to Section 212.-83 which were adopted on December 24, 1974, contemporaneously with the adoption of Subpart K. (39 Fed.Reg. 44407 at 44411, December 24, 1974). The obvious inference is that the deletion of this prohibition was a conforming amendment so that Subpart K could "determine" the transfer price for interaffiliate transfers. The administrative record contains no other persuasive rationale for this contemporaneous action.

Finally, it appears to me that the declared objectives of the FEA could be accomplished only by reading Subpart K to mean what it literally says. The FEA expressly patterned the Subpart K regulations after the provisions in Subpart D which provided an incentive increment to crude oil producers. See 39 Fed.Reg. at 32719 (September 10, 1974); 39 Fed.Reg. at 44409 (December 24, 1974). Like the Subpart D increment, the adjusted first sale prices established in Subpart K were designed primarily to create an incentive to increase production of NGLs and NGLPs. In the preamble to the final regulations, the FEA stated that:

> in calculating the weighted average price at which propane was lawfully priced in transactions on May 15, 1973, for use in the price rule, a seller of propane in a first sale transaction may use the higher of its actual weighted average selling price per gallon on that date, or 8.5 cents per gallon. This provision should help insure that *all processors of natural gas will have margins comparable to historical levels—thus providing a continuing incentive to produce natural gas liquid products.*
>
> The FEA has further determined that, in view of the fact that prices for butane and natural gasoline have historically exceeded the price of propane by an average of 0.5 cents per gallon for butane and 1.5 cents per gallon for natural gasoline, the May 15, 1973 prices which may be used for these two products for purposes of the price regulations will be the higher of the actual price on that date for each product, or 9 cents per gallon for butane and 10 cents per gallon for natural gasoline.

39 Fed.Reg. at 44409 (December 24, 1974) (emphasis added).

When the FEA provided the $1.00 per barrel production incentive for crude oil in December 1973, it recognized interaffiliate transfers as "first sales" in order to make the Subpart D incentive price available to all crude oil producers without disrupting historical market relationships. If transfer sales had not been made eligible for the incentive increment, crude oil producers which normally sold their production to affiliated entities would either (1) have been deprived of this incentive price and, of course, would not have reacted to it by increasing production and exploration expenditures, as intended by the FEA, or (2) have terminated their historical supply relationships with their affiliated entities and begun selling their production to third parties, in order to receive the incentive price.

For the same reasons as in Subpart D, the FEA provided that interaffiliate transfers would constitute "first sales" under Subpart K. There can be no dispute that failure to recognize interaffiliate transfers as first sales would have denied virtually the entire incentive of the Subpart K adjusted prices to those processors who transferred their NGLs and NGLPs to affiliated entities. Under the DOE's interpretation, the incentive price provision would have allowed the unaffiliated processor to receive a greater margin or economic return than in May 1973, but would have frozen the margins of the affiliated processor and its marketing affiliate at their May 1973 levels. There would have been no incentive for the affiliated processor to continue or to increase the extraction of NGLs and NGLPs, since the economic return being realized by the affiliated processing entity would have remained at the depressed levels which the adjusted Subpart K prices were expressly designed to increase. Plaintiff's interpretation, on the other hand, would provide precisely the same incentive margin to both processor-marketers and unaffiliated processors.

In addition to the "adjusted" May 15, 1973 prices, the FEA also established even higher "imputed" May 15, 1973 prices which could be used only for NGLPs produced in gas plants built after January 1, 1975. This provision was, of course,

> intended to provide an incentive for the construction of new plants, and thereby to maximize supply.

39 Fed.Reg. at 44411. As with the adjusted May 15, 1973 prices, the incentive for new gas plant construction intended to be provided by this provision would have been substantially or wholly unavailable to the integrated firms which produce more than three-fourths of the nation's gas plant derived NGLs and NGLPs. The purpose of the incentive pricing provision would, therefore, have been vitiated.

The DOE makes four additional arguments which warrant comment: (1) the Court should defer to the agency's construction of its own regulations, (2) transfer pricing is an undesirable basis for a scheme regulating the pricing of NGLs and NGLPs, (3) processor-marketers are subject to a single firm rule imposed by Subpart E or, independently, by form FEO–96, this forecloses transfer pricing, and (4) the processor-marketers' construction of Subpart K cannot be reconciled with the provisions of Subpart F and Section 212.91 thereof, in particular.

The DOE maintains that its construction of Subpart K is at least a reasonable one and should, therefore, be accepted by this Court. This contention is reminiscent of the argument advanced by the agency in *Standard Oil v. DOE*, 596 F.2d 1029 (Em.App.1978), and is similarly flawed. There, the Temporary Emergency Court of Appeals made the following observations which are equally pertinent here:

> ... In *Udall [v. Tallman]* the Court deferred to the agency's interpretation of regulations which had long "been a matter of public record and discussion". *Udall*, 380 U.S. [1] at 17–18, 85 S.Ct. [792] at 802, 13 L.Ed.2d [616] at 626. On the other hand, in *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 156, 64 S.Ct. 474, 481, 88 L.Ed. 635, 644 (1944), the Court did not defer to an administrative construction of a controlling statute which was challenged as soon as it was made and had not "seasoned or broadened into a settled administrative practice."

> We do not, of course, question the rule of deference set forth in *Udall v. Tallman* and related cases. This rule is simply not applicable to the FEA's interpretation first announced on February 1, 1976, at the end of the relevant period. The FEA relies upon an after the fact interpretation in the preamble to the new rule that, "The order specified in the new Section 212.85 is the same as that under the regulations previously in effect." Yet, it is undisputed that during the relevant period the only public pronouncements ... were contrary to the interpretation set forth in the February 1, 1976 rule.

The DOE in this case similarly took its present position at the end of the relevant

period when, on September 21, 1978, it declared what it claimed had always been "implicit" in Subpart K. 43 Fed.Reg. at 42994 (September 21, 1978). This suit was instituted on October 30, 1978 and the agency's rationale for its position has been in some flux since that time. In these circumstances, I believe the text of the regulations and the administrative record are far more reliable indicators of the original intent than the agency's new found stance.

The DOE next argues that transfer pricing as applied to NGL and NGLP sales is subject to abuse and discrimination. Unlike the transfer pricing for domestic crude oil under Subpart D, which is easily verifiable by reference to a posted field price, it is said that transfer pricing for NGLs and NGLPs would be a regulatory nightmare and could not be successfully administered without detailed rules to control the discretion of the regulated companies and thereby prevent abuse. While transfer pricing of NGLs and NGLPs is undoubtedly subject to abuse, the potential for abuse does not appear to be as great as suggested by the DOE and certainly does not lead me to conclude that Subpart K does not mean what it says on its face. The DOE, as I understand it, does not claim that processor-marketer tailgate prices were artificially high on May 15, 1973 so as to lead to unduly high prices in the marketplace. Rather, it claims that the transfer prices were lower than they would have been in arms-length transactions. If so, I fail to see how transfer pricing could produce anything other than what the FEA intended—an incentive for increased production to those whose May 15, 1973 prices were below the minimum floors set in Subpart K.

The DOE also asserts that if interaffiliate transfers were recognized as first sales, the incentive prices would be available to processor-marketers but not to "other gas processors" who did not "happen to have booked an internally computed transfer price on May 15, 1973." As the plaintiff-processors point out, this record provides no basis for concluding that such firms in fact exist. None responded to the invitation to comment on the September 1974 proposals.

But in any event, even if some discrimination of this sort will result from construing the regulations literally, it is better to leave any such inequity to the exception process rather than to adopt a construction of production incentive regulation which would discriminate between processors by denying the incentive bonus to integrated gas processors (including processor-marketers and refiner-processors) who together account for more than 75% of the nation's NGLs and NGLPs.

Section 212.31 provides definitions generally applicable throughout the Mandatory Petroleum Price Regulations. That section states, *inter alia*:

"Firm" means any association, company, corporation, ... partnership or sole proprietorship, or any other entity however organized .... The DOE may, in regulations and forms issued in this part, treat as a firm: (1) a parent and the consolidated and unconsolidated entities "if any" which it directly or indirectly controls, (2) a parent and its consolidated entities, (3) an unconsolidated entity, or (4) any part of a firm.

The DOE points out that Section 212.82 of Subpart E adopts the first of these possible definitions of "firm" for the purposes of that Subpart. It also points to a reporting form which reflects a similar "single" firm concept. These provisions, the DOE argues, are inconsistent with a scheme which would treat interaffiliate transfers as first sales under Subpart K.

I may assume for present purposes that there was a single firm rule applicable to processor-marketers between the promulgation of Subpart K and November 1, 1978. As the DOE has itself acknowledged, the single firm concept is not necessarily inconsistent with a scheme which treats transfers from processors to their affiliated marketers as first sales. In the preamble to the September 1978 amendments, the DOE, after declaring that the "single firm" concept "has always been implicit in Subpart K, notwithstanding the absence of a specific definition of the term 'firm'," observed:

... Of course, the application of this concept does not per se preclude the allowance of transfer pricing if other provisions permit such pricing. Several commenters contended that other provisions do just that. They argue that the language "all sales * * *, including transfers between affiliated entities," in § 212.-161(a) (quoted in full above), necessarily means that transfers between affiliated entities are "sales" for subpart K purposes, and that the first transfer for a unit "price" is therefore a "first sale" within the meaning of subpart K.

43 Fed.Reg. 42995.

After further study of Subpart K,[20] I agree with the DOE that transfer pricing and the single firm concept are not inconsistent and I agree with the "commentators" that Section 212.161 necessarily means that a first transfer for a unit price is a first sale within the meaning of Subpart K.

In a similar vein, the DOE contends that the processor-marketers' marketing entities are subject to the provisions of Subpart K and not those of Subpart F, because, inter alia, they do not qualify under the 5% rule of Section 212.91. It is argued that this means there can be no first sale treatment for transfers to them. Suffice it to say, I have concluded that first sale treatment would be required by Subpart K for such transfers even if the affiliated marketers' pricing is to be determined under Subpart K.[21]

### TRANSFERS TO AFFILIATED REFINERS UNDER THE ORIGINAL SUBPART K

The provisions of Subpart K dealing with gas plant operators which also refined crude (i. e. processor-refiners) are different than those dealing with gas plant operators who do not refine crude (i. e. processor-marketers) and, accordingly, place the language of Section 212.161(a) in a somewhat different context. The DOE maintains that this context is crucial to an accurate understanding of the regulations and, accordingly, I set forth the text of the entire Section 212.161 even though portions have been quoted earlier:

§ 212.161 Applicability and relationship to other subparts.

(a) *Scope.* This subpart applies to all sales of natural gas liquids and natural gas liquid products, including transfers between affiliated entities, by all firms, including gas plant operators, producers of natural gas, natural gas royalty owners, and refiners except sales by resellers or retailers, which are subject to Subpart F of this part.

(b) *Relationship to other Subparts—(1)* Gas plant operators. *Refiners that only refine liquid hydrocarbons from oil and gas field gases and do not refine crude oil shall determine their maximum lawful prices pursuant to this Subpart K and are not also subject to Subpart E.*

(2) *Crude oil refiners which are also gas plant operators—(i) General.* Refiners that refine liquid hydrocarbons from oil and gas field gases, and also refine crude oil, shall determine their May 15, 1973 selling prices and increased costs for natural gas liquids and for natural gas liquids products produced in gas plants pursuant to this subpart, but shall determine their maximum lawful selling prices pursuant to Subpart E.

**20.** This further exposure to the regulations has caused me to alter the tentative views expressed in my opinion on the preliminary injunction motions regarding the single firm concept.

**21.** Whether the marketing entity's sales is governed by Subpart F or Subpart K, the transfer from the processor to its marketing affiliate would be the "first sale" under Subpart K, and would thereby be eligible for the adjusted May 15, 1973 prices. The subsequent sale by the marketing affiliate would be regulated either by Subpart F, as processor-marketers contend, or by Subpart K. If Subpart F were applicable, the allowable Subpart K first sale price would become a cost of purchased product to the marketing affiliate which it would use in determining its increased product costs. If, instead, it were assumed that Subpart K could be applicable to the sale by the marketing affiliate, the allowable Subpart K first sale transfer price would constitute an increased cost to the marketing affiliate under § 212.166(b)(1).

(ii) *Calculation of increased product costs.* Such refiners shall calculate the increased product costs of all natural gas liquids (except natural gas liquids which are separated from natural gas at the well head of an oil well, and purchased as crude oil) and the increased product costs attributable to natural gas liquid products pursuant to §§ 212.146 and 212.147 of this subpart, and shall add the amount of increased product costs so determined to the amount of increased product costs incurred in each month of measurement and determined to be allocable to other than special products under the refiner's cost allocation formulae of § 212.-83(c)(1), provided that the amount of such increased product costs allocable to propane prices is limited pursuant to the provisions of § 212.147(c) and § 212.83(c)(1)(iii).

(iii) *Calculation of increased non-product costs.* Such refiners shall calculate increased non-product costs attributable to natural gas processing pursuant to § 212.145, and shall add the amount of increased non-product costs so determined to the amount of increased non-product costs incurred in each month of measurement and determined to be allocable to prices charged for covered products pursuant to the § 212.87(b), provided that the inclusion of such increased non-product costs determined pursuant to § 212.145 in prices charged by such refiners shall constitute the charging of an allowable price in excess of base price which will make such refiners subject to the profit margin limitation of § 212.82(d).

(c) *Sales of ethane.* This subpart does not apply to sales of ethane.

As earlier noted, the DOE relies primarily on the provisions of Section 212.161(b)(2) to support its position that the original Subpart K did not intend to authorize first sale treatment for interaffiliate transfers. It maintains that the only way for processor-refiners to receive the benefit of the adjusted and imputed prices on transfers from affiliated gas plants is to read Subpart K,

(1) as authorizing the calculation of a "maximum lawful price" for such transfers consisting of the adjusted and/or imputed May 1973 price plus increased product and non-product costs, and (2) as authorizing the use of that "maximum lawful price," including its increased non-product cost component, as the refiner's cost for inclusion in the "B", increased product cost, pool under the refiner Subpart E pricing formula. The DOE stresses, however, that Section 212.161 nowhere contains a command that processor-refiners determine a "maximum lawful price" under Subpart K for transfers from an affiliated processor. Rather, it instructs them to determine only their May 1973 selling prices and increased product and non-product costs under Subpart K, and to determine their maximum lawful price under Subpart E. Moreover, the DOE emphasizes that, even if Subpart K contains authority for determining a "maximum lawful price" on interaffiliate transfers, subsections (b)(2)(ii) and (iii) direct that increased gas plant *product* costs be added to the "B" cost pool of the Subpart E formula and that increased *non-product* costs to allocated to the "N" increased non-product cost, pool of that formula.

■ The processor-refiners respond that first sale treatment of interaffiliate transfers does not require that refiners carry a "unitary" cost figure into the Subpart E formula, arguing that the cost *allocation* provisions of subsection 212.161(b)(2) and Subpart E can be followed without ignoring the pricing provisions of Subpart K which mandate recognition of interaffiliate transfers as events of regulatory significance. The processor-refiners further emphasize that a denial of first sale treatment would be contrary to the history and purpose of Subpart K and would read subsection (a) of Section 212.161 out of the regulations. They suggest that the language of the entire text, the history, and the agency's objectives can best be reconciled by recognizing transfers of NGLs to affiliated refiners as first sales (thus providing the intended incentive of adjusted and imputed May 1973 prices), by transferring the increased non-

product cost portion of the maximum transfer price to the "N" pool, and by allocating the remainder thereof to the "B" pool.

While it is true that the processor-refiners' theory does not fit the text of the regulations as precisely as that of the processor-marketers, its fit is far superior to that of the DOE. The insurmountable problems with the DOE's present interpretation of the obligations of processor-refiners under Subpart K are basically the same as in the case of the processor-marketers. Every theory the DOE conceives necessarily views an interaffiliate transfer as an unregulated and, accordingly, insignificant event, while the original Subpart K can only be read to say that "all sales ... including transfers between affiliated entities" are regulated by Subpart K and are significant events. Moreover, the DOE simply cannot escape the fact that the September proposals authorized first sale treatment of interaffiliate transfers, the fact that the language of the proposed regulations which granted that authority, as well as language comparable to that in Section 212.141(b)(2), passed into the final regulations without material change, the fact that wording was added to the final regulations unambiguously supporting the continuation of that authority, or the fact that nothing in the record suggests any change in the agency's view between September and December.

Finally, I conclude that the processor-refiners' interpretation of the regulations squares better with the declared objectives of the FEA than with that of the DOE. It is true, as the DOE urges, that the FEA expressed a concern in the fall of 1974 about a disparity between the price of propane produced in the crude oil refining process and propane extracted from wet gas. This disparity was due not to differences in May 15, 1973 prices, but rather to the fact that crude oil refiners, unlike gas processors, could add increased crude oil costs to their May 15, 1973 prices as increased product cost. Partial alleviation of this disparity was apparently one objective of the FEA in promulgating Subpart K, albeit one subsidiary to the predominant purpose of encouraging increased supply.

Thus the agency observed in its preamble to the final regulations that adjusted first sale prices

should help insure that all processors of natural gas will have margins comparable to historical levels—*thus providing a continuing incentive to produce natural gas liquid products.*

\* \* \* \* \* \*

These provisions with respect to adjusted May 15, 1973 prices are intended to remove inequities that have resulted from nonrepresentative May 15, 1973 prices. *Although not intended primarily as a measure to reduce current price disparities,* this provision should also tend to alleviate the price disparity problem in the marketing sector of the propane industry. (Emphasis supplied)

I confess that it is not clear to me why the FEA made this last prediction. On the other hand, however, I also fail to see how denying adjusted first sale prices to integrated processor-marketers and integrated processor-refiners, as the DOE's present construction would do, would materially aid this subsidiary objective. It is clear to me, however, that this approach would materially undercut the primary objective of first sale pricing.

## COMPLIANCE WITH THE APPLICABLE PROCEDURAL LAW IN 1974

Having construed Subpart K in the manner described above, the procedural arguments advanced by the plaintiffs in the alternative are no longer apposite.

## TRANSFERS BETWEEN AFFILIATED ENTITIES AFTER NOVEMBER 1, 1978

On June 9, 1977, the agency proposed detailed amendments to Subpart K in order to "clarify" its application to the marketing operation of gas processors which do not also refine crude oil. 42 Fed.Reg. 29490 (June 9, 1977). Over one year later, on September 21, 1978, it promulgated amendments to these regulations. 43 Fed.Reg.

42984 (September 21, 1978). These amendments, which became effective on November 1, 1978, purported to eliminate from Section 212.161(a) the provision applying Subpart K to "transfers between affiliated entities."

Plaintiffs contend that this portion of the 1978 amendments is invalid because the June 1977 notice contained no reference to a proposed change in the application of the first sale provisions of Subpart K to interaffiliate transfers.[22] The DOE's sole response is that interaffiliate transfers were not first sales under the prior law and, accordingly, that no change in this area was effected by the amendments. It does *not* argue that, even if the plaintiffs are right about the prior law, the June 1977 notice was nevertheless legally adequate. The absence of such an argument and my conclusion regarding the first sale issue may obviate the need for further comment. A brief discussion of this issue is appropriate, however, in light of the tentative view which I expressed at the time of the motion for a preliminary injunction. *See* 464 F.Supp. at 1159–60. I have concluded that the view then expressed was in error.

It is undisputed that notice of the amendment deleting the phrase "transfer between affiliated entities" was not included in the 1977 notice of proposed rulemaking. The basis of my earlier view that the notice nevertheless would be held to be adequate was based on the fact that the notice did propose to include a "single firm" definition in Subpart K. At that time I was under the misapprehension that the parties agreed that this single firm definition was inconsistent with transfer pricing and, accordingly, concluded that plaintiffs should have been aware that first sale treatment of interaffiliate transfers was a subject under

review. I now have a different view of the relationship between the single firm definition and the first sale issue.

■ As indicated in my earlier quotation from the definition section of Part 212, the term "firm" can have any one of a number of meanings, depending upon the regulatory provisions of each subpart or even of the various sections within a subpart. In Subpart E, for example, there is a single firm definition like that proposed for Subpart K in June 1977, but, at the same time, Section 212.83(b) provides that transfers between affiliated entities may be utilized to calculate increased costs for the purposes of that section. In recognition of this regulatory phenomenon, the DOE, it will be recalled, acknowledged in the preamble of the 1978 amendments that the addition of the single firm definition would not preclude transfer pricing if other provisions authorized it.[23] Accordingly, when the DOE proposed a single firm definition without proposing any amendment to the Subpart K provisions authorizing transfer pricing, this does not give notice that abolition of transfer pricing was under consideration.

While the July 1977 notice did discuss the issue of whether resales by marketing affiliates of processor-marketers should be regulated under Subpart F or Subpart K, that issue is also sufficiently distinct from the transfer pricing issue to preclude reliance by the DOE on that segment of the notice.

Over sixty companies commented on the proposed amendments.[24] However, of all the processor-marketers and processor-refiners which would have been affected if the amendments were proposed to have the effect of excluding interaffiliate transfers from the definition of "first sale", only two such companies commented at all on the recognition of interaffiliate transfers as

---

22. Plaintiffs also argue that no change was effected on November 1, 1978 because the DOE stated on October 31, 1978 that the September amendments "did not, and did not intend to, establish a new substantive rule concerning transfer pricing." 43 Fed.Reg. at 50843 (October 31, 1978). The argument is specious, however. Clearly, the DOE intended that interaffiliate transfers would not be entitled to first sale treatment after the effective date of the amendment.

23. 43 Fed.Reg. 42984 at 42995 (September 21, 1978).

24. *See* DOE's Administrative Record of the September 14, 1978 rulemaking, at 000027–001592.

first sales. These two companies were InterNorth and Mapco, the two companies which had submitted interpretation requests—still pending at that time—concerning both the interaffiliate first sale and the marketing cost issues.

The Third Circuit was faced with a similar situation in *Wagner Electric Corp. v. Volpe*, 466 F.2d 1013 (1972), in which the National Highway Traffic Safety Administration ("NHTSA") asserted that a proposal to eliminate permissible failure rates from the safety standard for motor vehicle turn signals provided an adequate notice of its final action in which it also down-graded the performance criteria for such devices. The NHTSA

> buttresse[d] this argument by pointing in the record to the responses to the notice from flasher manufacturers and automobile manufacturers which did in some instances discuss the desirability of downgrading performance criteria if permissible failure rates were eliminated.

466 F.2d at 1019.

The Third Circuit rejected the argument that adequate notice has been given under the Administrative Procedure Act ("APA"):

> We cannot accept the Administrator's position .... *The fact that some knowledgeable manufacturers appreciated the intimate relationship between the permissible failure rate provisions and the performance criteria, and so responded, is not relevant. Others possibly not so knowledgeable also were interested persons within the meaning of 5 U.S.C. § 553.*

*Id.* (Emphasis supplied).

In the case of the June 1977/September 1978 Subpart K rulemaking, which was subject to the FEAA as well as the APA, there was no "intimate relationship" between the marketing cost issue for which notice *was* given and the first sale issue, for which notice was *not* given.

Under the APA, a DOE notice of proposed rulemaking must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). The June 1977 notice of proposed rulemaking did not give notice of a proposal to preclude first sale treatment for interaffiliate transfers. It follows that the September 1978 amendments, to the extent they delete the clause "including transfers between affiliated entities," are invalid and that the law regarding first sale treatment for interaffiliate transfers was not altered on November 1, 1978.

CONCLUSION

In summary, I hold that, since January 1, 1975, Subpart K of the Mandatory Petroleum Pricing Regulations has authorized "first sale" treatment for interaffiliate transfers which meet the requirements of the "first sale" definition in 10 C.F.R. § 212.162.

SUBMIT ORDER.