EXXON CORPORATION, Plaintiff,

v.

DEPARTMENT OF ENERGY, and Wayne E. Gifford, Deputy Regional Administrator, Region VI, Defendants,

and

United States of America, Counterclaimant.

Civ. A. No. CA–3–78–1302–G.

United States District Court,
N. D. Texas,
Dallas Division.

May 21, 1981.

** Both the defendant and the plaintiff, however, are required to stipulate pretrial " * * * all undisputed facts. * * * " Local Rule 14.

**28**

Barbara Finney, Jon E. King, Exxon Corp., Houston, Tex., Fulbright & Jaworski by David J. Beck, J. Todd Shields, Sheila J. Lee, Houston, Tex., for Exxon Corp.

Barbara Allen Babcock, Asst. Atty. Gen., Civ. Div., Washington, D. C., Kenneth J. Mighell, U. S. Atty., by Judith A. Shepherd, Asst. U. S. Atty., Dallas, Tex., Dennis G. Linder & Barbara L. Gordon and C. Max Vassanelli, Dept. of Justice, Washington, D. C., for defendants; Thomas H. Kemp, Ger-

aldine O'Donnell, Dept. of Energy, Washington, D. C., of counsel.

## MEMORANDUM ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

This is an action for declaratory and injunctive relief brought by Exxon Corporation against the Department of Energy ("DOE")[1] and Wayne E. Gifford, Deputy Regional Director of Region VI of the Federal Energy Administration ("FEA"). Gifford is sued solely in his official capacity. Exxon seeks (1) judicial review of a "Remedial Order" issued by the FEA on April 26, 1977 and later amended in a final "Decision and Order" issued by the DOE's Office of Hearings and Appeals on October 2, 1978; (2) a declaratory judgment concerning the meaning and validity of 10 C.F.R. §§ 210.-62(a), (c) and Ruling 1974–10 (39 Fed.Reg. 15140, May 1, 1974); (3) permanent injunctive relief against enforcement at the April 26, 1977 Remedial Order, as amended; and (4) a determination whether Exxon's constitutional claims are substantial and should be certified to the Temporary Emergency Court of Appeals ("TECA"). The ultimate issue in this case is the validity of the DOE's ruling that Exxon violated the agency's Mandatory Petroleum Price Regulations by discontinuing acceptance of Bank Americard and Master Charge credit cards ("Bankcards") on September 1, 1974. At this juncture, however, the question presented is whether Exxon shall be entitled to any discovery before disposition of the merits on DOE's Motion for Summary Judgment, and if so, what the proper scope of discovery should be in this case.[2]

*Regulatory Background*

In the fall of 1973, as part of the federal government's Phase IV Economic Stabiliza-

---

**1.** On October 1, 1977, DOE succeeded to the functions previously performed by the FEA. For convenience, I will refer collectively to the Department of Energy and its predecessor agencies as the "Agency" or the "DOE".

**2.** The motions pending before the Court include Plaintiff's Motion to Compel Answers to Inter-

rogatories and Production of Documents; Plaintiff's Motion for Discovery under Rule 56(f); Defendants' Motion for Summary Judgment; Defendants' Motion for Protective Order or, in the Alternative, for a Stay Pending the Court's Disposition of Defendants' Motion for Summary Judgment.

tion Program, the Cost of Living Council promulgated regulations limiting the prices which a supplier of petroleum products could charge retailers and consumers. *See* 38 Fed.Reg. 27290 (1973) (modifying 6 C.F.R. § 150.359). The regulations restricted the price a supplier could charge any class of purchasers for specified petroleum products to the price charged such purchasers on a base date (May 15, 1973) plus any increased product costs since that base date. *Id.* at § 150.355, *et seq.*[3] Subsequent to Exxon's discontinuance of Bankcards on September 2, 1974, the base price was interpreted to include the manner and form of any consideration received for the sale of covered petroleum products and the time in which payment must be made. *See Atlantic Richfield Company*, 3 FEA Par. 80,522 (December 12, 1975). According to the DOE, the Phase IV price regulations required suppliers to maintain all customary price differentials, including credit terms in effect on May 15, 1973. The substance of these regulations was incorporated into the new Mandatory Petroleum Allocation and Price Regulations, 10 C.F.R. §§ 200–212, 39 Fed.Reg. 1924 (Jan. 15, 1974) under the authority of the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. § 751 *et seq.*[4]

In addition to the price rules, the agency issued regulations on January 14, 1974 requiring the maintenance of "normal business practices." 10 C.F.R. § 210.62. These included a prohibition against imposing more stringent credit terms or payment schedules than those in effect during the base period. Sections 210.62(a) and (c) of the "normal business practices" regulation are central to this litigation and provide in pertinent part:

§ 210.62 *Normal Business Practices*

(a) Suppliers will deal with purchasers of an allocated product according to normal business practices in effect during the base period specified in Part 211 for that allocated product and no supplier may modify any normal business practices so as to result in the circumvention of any provision of this Chapter.... Credit terms other than those associated with seasonal credit programs are included as part of the May 15, 1973 price charged to a class of purchaser under Part 212 of this Chapter.... No supplier may require or impose more stringent credit terms or payment schedules on purchasers than those in effect for that class of purchaser during the base period (for seasonal credit), or on May 15, 1973 (for other credit terms). 39 Fed.Reg. 5311 (February 12, 1974), amending 10 C.F.R. § 210.62, published at 39 Fed.Reg. 1924, 1931 (January 15, 1974).

\* \* \* \* \* \*

(c) Any practice which constitutes a means to obtain a price higher than is permitted by the regulations in this chapter or to impose terms or conditions not customarily imposed upon the sale of an allocated product is a violation of these regulations. Such practices include ... the failure to provide the same services ... previously sold.

The agency further addressed the inter-relatedness of credit terms and the base price in Ruling 1974–10, 39 Fed.Reg. 15140, May 1, 1974. In pertinent part, that Ruling stated:

> Preservation of an economically sound and competitive petroleum industry; including the priority needs ... to restore and foster competition in ... distribution [and] marketing ... and to preserve the competitive viability of ... branded independent marketers. 15 U.S.C. § 753(b)(1)(D).

Equitable distribution of ... refined petroleum products at equitable prices among all regions and sectors of the United States and sectors of the petroleum industry, including ... branded independent marketers and among all users. 15 U.S.C. § 753(b)(1)(F).

---

**3.** The term "class of purchasers" was defined as "purchasers ... to whom a person has charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers ... and other purchasers." A "customary price differential" was defined as a "price distinction based on a discount, allowance, add-on, premium ... or a term or condition of sale or delivery."

**4.** Section 4(b) of the EPAA, 15 U.S.C. § 753(b) set forth the policy goals which the regulations were to foster, among which were:

Thus, the May 15, 1973 price includes both the price per gallon of gasoline and the time within which that price had to be paid, i. e., the credit terms that prevailed on that date. The imposition of more stringent credit terms by a refiner would constitute an impermissible increase in the May 15, 1973 price because it would reduce the time within which payment had to be made. The cost of credit for the period between deliveries which was incurred by firm A would, if the terms could not be altered, have to be paid by firm B.

Firm A could change its credit practices with respect to firm B only if it first applied to the FEO, and made a showing as to why the change was necessary, and if the FEO authorized the change, as well as an appropriate adjustment to firm A's May 15, 1973 price.

From the outset of this controversy, the agency has maintained that these regulations and rules prohibited Exxon from modifying any normal business practice in effect on May 15, 1973, or from imposing more stringent credit terms than those in effect on that date, without prior approval from the agency and a corresponding adjustment, if necessary, to the firm's May 15, 1973 price.

*Administrative Procedures*

Agency regulations in effect in April of 1977 provided for a multi-step enforcement and administrative review process to facilitate compliance with the agency's regulations.[5] Subpart O of 10 C.F.R. § 205 sets forth the enforcement procedures and the

method by which a firm subject to administrative action can challenge such actions. Pursuant to 10 C.F.R. § 205.190(b), the agency may commence a proceeding to insure compliance with agency regulations by serving a Notice of Probable Violation ("NOPV"). The recipient of an NOPV may respond in writing and may request a conference with DOE to discuss the NOPV. § 205.191(c). After receipt of a reply, if any, or expiration of the 10 day reply period, the agency may issue a Remedial Order setting forth the factual and legal grounds supporting a determination that a violation of agency regulations has occurred. 10 C.F.R. § 205.192. Remedies which can be ordered in a Remedial Order include restitution, price rollbacks and assessment of interest. C.F.R. § 205.195(a).

A party may appeal a Remedial Order to the Office of Hearings and Appeals. 10 C.F.R. §§ 205.191, 295.196(b). During the administrative appeal from a Remedial Order, an appellant may raise all of its factual and legal defenses to the allegations contained in the Remedial Order. 10 C.F.R. § 205.105(a). Appellate consideration culminates in issuance of a final Decision and Order, affirming, modifying or vacating the Remedial Order.[6]

Agency enforcement capability was bolstered by civil penalty provisions. The penalty applicable to this lawsuit was set forth in Section 208 of the Economic Stabilization Act, 12 U.S.C. § 1904 note, incorporated by reference into the EPAA, § 5(a), 15 U.S.C. § 754(a)(1).[7] It provided that "any person

---

**5.** The administrative procedures under which the agency acted in this case were superceded in mid-stream. The superceding regulations expressly provide, however, that where an administrative appeal is taken from a Remedial Order issued prior to January 6, 1978, the effective date of the new regulations, such appeal should be completed under the old procedures as was done in this case. 43 Fed.Reg. 1930 (Jan. 17, 1978), effective January 6, 1978, as corrected by 43 Fed.Reg. 3995 (Jan. 31, 1978); 10 C.F.R. § 205.199(b)(1).

**6.** A Remedial Order will be reversed on appeal if the appellant establishes that the Regional Administrator's action was "erroneous in fact or in law" or was "arbitrary or capricious." 10

C.F.R. §§ 205.106(b)(2)(ii)–(iii). An order denying an appeal must set forth the agency's findings of fact and conclusions of law and state that it is a final order subject to judicial review. 10 C.F.R. § 205.107(b).

**7.** In its Summary Judgment brief, the agency states that its authority to impose civil penalties derives from Section 208 as incorporated into the EPAA. While noting that the ESA expired on April 30, 1974, the agency asserts its enforcement authority was preserved by a savings clause, § 218, which authorized the imposition of "civil penalties for violations occurring before the expiration of the ESA." *Defendants' Memorandum of Points and Authorities in Support of Defendants Motion for Summary Judg-*

who violates any provision of this chapter or any order issued pursuant thereto shall be subject to a civil penalty of not more than $2,500 for each violation." 10 C.F.R. § 205.202(c)(1), *superceded by* 10 C.F.R. § 205.203(b)(iii).

The regulations authorizing issuance of a remedial order do not require a "determination on the record after opportunity for an agency hearing." Therefore, the Administrative Procedure Act's procedural standards for adjudication do not apply. *See* 5 U.S.C. § 554. Claims that administrative adjudications under the predecessor ESA should be subjected to the full panoply of APA procedural safeguards have been rejected by the Temporary Emergency Court of Appeals ("TECA").[8] *See Plumbers Loc. U. No. 519, v. Construction Ind. Stab. Com.*, 479 F.2d 1052, 1055 (Em.App.1973); *cf., Carpenters 46 County Conf. Bd. v. Construction Ind. Stab. Com.*, 522 F.2d 637, 638–39 (Em.App.1975) *cert. denied* 425 U.S. 951, 96 S.Ct. 1724, 48 L.Ed.2d 194 (1976). During the time frame in question, however, the agency was subject to the APA's rulemaking provisions, 5 U.S.C. § 553. *See* 15 U.S.C. § 754(a)(1) (EPAA § 5(a)(1)). *See also, Phillips Petroleum Co. v. DOE*, 449 F.Supp. 760, 798–801 (D.Del.1978) *aff'd sub. nom.* 596 F.2d 1029 (Em.App.1978).

*Factual Background*

Beginning in 1970, Exxon made available to its retailers an optional Bankcard program. It is undisputed that, with some regional variations, Exxon retailers could use Bankcard receipts to pay for gasoline purchased from Exxon or could submit the receipts to Exxon in return for payment of their face value on a cost-free basis. Exxon executed agreements with the credit card firms providing that, upon presentation by Exxon of sales invoices evidencing Bank-

card sales, participating banks would pay Exxon the face value less a fee based on the percentage of the value of sales invoices submitted. Exxon incurred all costs of administering the Bankcard program. Exxon also made available to retailers on similar terms its own credit card system. Administrative Record ("AR") at 30–31. The two systems were in effect on the May 15, 1973 base date.

On September 1, 1974 Exxon discontinued its arrangements with the issuing banks due to an increase in the fee charged by the banks. Accordingly, Exxon ceased honoring Bankcard invoices from retailers. Exxon did not apply to the Federal Energy Administration for approval before terminating the Bankcard program. AR at 31.

On July 11, 1975 DOE issued an NOPV to Exxon, stating that the agency had reason to believe Exxon's discontinuance of the Bankcard program violated 10 C.F.R. 210.-62(a) (imposition of more stringent credit terms). On July 31, 1975 Exxon submitted a written response pursuant to 10 C.F.R. § 205.191. On October 15, 1975, at an informal conference, representatives of the Agency and Exxon discussed the NOPV. A year and a half later, on April 26, 1977, the Regional Administrator for Region VI issued a Remedial Order finding that Exxon had imposed more stringent credit terms in violation of 10 C.F.R. §§ 210.62(a), (c). AR at 35. Exxon was ordered (1) to reinstate the Bankcard program on the terms existing on May 15, 1973 or to lower its selling prices by an amount reflecting the savings to the firm resulting from the discontinuance, (2) according to specified formula, to reimburse retailers for costs saved by Exxon during the period of discontinuance. The amount of refunds required was not

---

ment, p. 10, note 9. By its terms, however, Section 218 only extends the ESA for "any action or proceeding based upon any *act committed prior to May 1, 1974*." Though the parties have not addressed the issue, the fact that Exxon discontinued its program on September 1, 1974 raises a question concerning the agency's authority to impose a civil fine for noncompliance in this case.

8. Section 207 of the ESA expressly exempted agency action under the Act from most of the provisions of the APA, including § 556 on the conduct and right of participants in administrative hearings. Though the ESA expired on April 30, 1974 prior to the proceedings in this case, the parties have not argued the APA's procedural requirements apply to the Remedial Order and OHA Decision issued by the agency.

specified, but Exxon was directed to secure data from its retailers for purposes of computing the amount. The Remedial Order threatened imposition of civil sanctions for noncompliance pursuant to 10 C.F.R. § 205.-203. AR at 38.

On October 2, 1978 the decision of the Regional Administrator was affirmed by written decision of the FEA Office of Hearings and Appeals after a hearing on June 16, 1977. See AR at 109, 111–123. The Remedial Order was amended to clarify the method for calculating reimbursements. AR at 123. On February 27, 1979, counsel for both parties agreed to a stay of the Remedial Order until a final order on the merits by this Court.

*Applicable Standards of Review*

■ The "substantial evidence" test is the prescribed standard for judicial review of findings made in orders issued under the EPAA. See Section 211(d)(1) of the ESA, as incorporated by Section 5(a)(1) of the EPAA, 87 Stat. 633.[9] *Chrysler Corp. v. Dunlop*, 490 F.2d 985, 988 (Em.App.1973). In reviewing the remainder of the agency's action in this case, its promulgation, interpretation, application and enforcement of its rules and regulations, as well as the conclusions of the Regional Administrator and Office of Hearings and Appeals, the Court must determine whether the decision was based on a consideration of the relevant factors, whether there was a clear error of judgment, and whether the agency has articulated a rational connection between the facts found and the choice made. *Bowman Transportation, Inc. v. Arkansas Best Freight System*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–442, 42 L.Ed.2d 447 (1974); *McCulloch Gas Processing Corp. v. DOE*, 650 F.2d 1216 at 1219 (Em.App.1981). The burden of persuasion to show the invalidity of DOE regulations and orders under § 211 is on the party challenging their validity. *Powerline Oil Co. v. FEA*, 536 F.2d 378, 387 (Em.App.1976).

*I. Whether Discovery is Needed to Complete the Administrative Record.*

DOE has moved for Summary Judgment based on certain uncontroverted findings of the Regional Administrator. See AR 73–74 ("C. Findings"). The "Findings" relied on describe briefly Exxon's Bankcard program and recite that it was terminated. It is the agency's position that the termination was a *per se* violation of 10 C.F.R. §§ 210.62(a) and (c) in that it modified a normal business practice so as to circumvent the price rules, imposed more stringent credit terms on purchasers, and obtained a higher price by reducing the amount of services previously sold.

Exxon complains it is unable to respond to the DOE's Motion because the Administrative Record submitted by the agency is incomplete. Exxon further maintains the Administrator made certain material findings other than those relied on by the agency which are disputed and are not based on uncontroverted facts. It is Exxon's position that it would be premature to rule on the DOE's Motion for Summary Judgment until the Court is assured the Administrative Record is complete.

■ The Supreme Court has ruled that judicial review is to be based on the "full" administrative record that was before the agency at the time of the decision. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). While the Court later cautioned that the focal point for judicial review should be the Administrative Record "already in existence, not some new record made initially in the reviewing court," *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) the "whole record" is not necessarily those documents that the *agency* has compiled and submitted as "the" administrative record. Rather, in applying the substantial evidence test, the Court must look to all the evidence that

---

**9.** Section 211(d)(1) provides:
   No order of such agency shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence.

was before the decision-making body. *United States v. Carlo Bianchi, Inc.*, 373 U.S. 709, 715, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963); *cf. Marathon Oil Co. v. DOE*, 642 F.2d 436, 439 (Em.App.1981). The "whole" administrative record, therefore, consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–465, 95 L.Ed. 456 (1951); *Tenneco Oil Co. v. DOE*, 475 F.Supp. 299, 317 (D.Del.1979); *Petrolane Inc. v. DOE*, 79 F.R.D. 115, 119 (C.D.Cal. 1978); *Dorchester Gas Producing Co. v. DOE*, No. 3–75–0836–W (N.D.Tex., Oct. 24, 1978); *cf. NLRB v. Bausch & Lomb, Inc.*, 526 F.2d 817, 829 (2d Cir. 1975) (Friendly, J. *dissenting*). Matters not considered by the agency, however, are outside the record evaluated for substantial evidence, are legally irrelevant, and therefore are not discoverable under Fed.R.Civ.P. 26. *Joseph G. Moretti, Inc. v. Hoffman*, 526 F.2d 1311, 1312 (5th Cir. 1976); *National Petroleum Refiners Ass'n v. F.T.C.*, 392 F.Supp. 1052, 1053 (D.D.C.1974).

■ Consistent with these general rules, the Court may look beyond the administrative record certified by the agency only when specified criteria are met. One factor identified by the Supreme Court as justifying expansion of the record is where the record submitted fails to explain the basis for administrative action, thereby frustrating judicial review. *Camp v. Pitts*, 411 U.S. 138, 142–143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The agency has argued that this is the only type of inadequacy warranting further discovery. *See* Defendants' Motion for Protective Order at 8. However, limited discovery to complete the record is also proper where the Court determines the agency has failed *to file* the "whole record." [10] *Natural Resources Defense Council, Inc. v. Train*, 519 F.2d 287, 291–92 (D.C.

Cir. 1975); *Appalachian Power Co. v. EPA*, 477 F.2d 495, 507 (4th Cir. 1973); *Tenneco Oil Co. v. DOE*, 475 F.Supp. 299, 317 (D.Del. 1979); *Amoco Production Co. v. DOE*, 512 F.Supp. 815 at 817, 819 (D.Del., May 29, 1979); *Petrolane Inc. v. DOE, supra*, 79 F.R.D. at 119 (C.D.Cal.1978). Thus, a record may be "adequate" because it fully articulates the agency's reasoning, yet at the same time be "inadequate" because it fails to provide the court all documents, memoranda and other evidence which were considered directly or indirectly by the agency. *See, Appalachian Power Co. v. EPA, supra*, 477 F.2d at 507.

DOE contends Exxon must make a strong showing of agency "bad faith" before discovery to complete the record can be ordered, relying on *Getty Oil Co. v. DOE*, No. CV–77–4533–WMB, slip op. at 3, (C.D. Cal., May 16, 1979). But courts offering plaintiffs an opportunity to determine, by limited discovery, whether documents properly a part of the administrative record have been withheld have not usually imposed such a requirement. *Compare, e. g. Natural Resources Defense Council v. Train, supra; Appalachian Power Co. v. EPA, supra; Tenneco Oil Co. v. DOE, supra; Petrolane Inc. v. DOE, supra; Amoco Production Co. v. DOE, supra*, with *Getty Oil Co. v. DOE, supra*. The "bad faith" rule is ordinarily applied only where "mental process discovery" is sought in the context of non-adjudicatory proceedings. *See Citizens to Preserve Overton Park v. Volpe, supra*, 401 U.S. at 420, 91 S.Ct. at 825; *Tenneco Oil Co. v. DOE, supra*, 475 F.Supp. at 316. No showing of bad faith was required in *Tenneco* or *Amoco*, for example, where incompleteness was evident from the record itself. *Tenneco Oil Co. v. DOE. Id.* at 317; *Amoco Production Co. v. DOE, supra*, at 819. Similar to this case, the record in *Tenneco* contained primarily Tenneco's submissions to the agency, along with the

---

10. In *Natural Resources Defense Council Inc. v. Train* the plaintiffs by affidavit made a substantial showing that the agency had not filed the entire administrative record. There was no ruling, however, that the court cannot make this determination without affidavit where the record submitted is incomplete on its face.

formal decisions and orders issued by the agency.[11] *Id.* at 317.

█ Discovery to complete the record is not to be broad-ranging. Its primary function is to offer assurance that the administrative record is complete in areas where completeness is suspect. *Amoco Production, Inc. v. DOE, supra,* at 817. Once this Court is assured that all materials considered by the agency have been proffered, discovery has served its purpose. Should the completed record still be deficient factually, such that the Court is unable to evaluate the factual predicate for the agencies findings and conclusions, the proper course may then be to vacate the decision and remand to the agency for further consideration and additional factual development, if appropriate. *Bank of Commerce v. City National Bank,* 484 F.2d 284, 288 (5th Cir. 1973), *cert. denied* 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109 (1974).

Exxon has made a strong showing that the Administrative Record certified to this Court is incomplete. Incompleteness is evident from the record's face. The 126 page record consists solely of two copies of Exxon's Appeal of the Remedial Order (*see* A.R. 1–78), Exxon's Application for Stay of the Remedial Order (*see* A.R. 78–88), the Decision and Order of the FEA granting a stay (A.R. 91–95) and the Decision and Order of DOE's Office of Hearings and Appeals ("Decision") (A.R. 111–123). The remaining pages are copies of letter correspondence between Exxon and the agency concerning administrative matters. Yet, in answer to Exxon's Request for Admissions, the agency has stated that the 126 pages "represents a full, complete, and accurate record of all evidence and data considered by the agency, either directly or indirectly, in support of the Remedial Order...."[12]

To repeat Judge Schwartz's apt remark in *Tenneco Oil Co. v. DOE, supra,* 475 F.Supp. at 317, "it strains the ... imagination" to assume that this record contains all the information and data considered by the agency. Not an iota of documentary "evidence" has been furnished. Indeed, the Record does not even contain Exxon's "written reply" to the agency's Notice of Probable Violation, which the Regional Administrator states was a document considered in reaching the finding of violation, and which is referred to throughout the Remedial Order and OHA Decision.[13]

While Exxon has not explicitly alleged "bad faith" on the part of DOE,[14] it has presented other evidence that the Record is incomplete. Exhibit A of Exxon's Motion for Discovery is a copy of an internal memorandum from Thomas Patton and Robert Heiss titled "Administrative Records of Rulemakings, Compliance Proceedings, and Adjudications" (July 20, 1978). The memorandum addresses the agency's "increasingly serious and pervasive problem in litigation because of a general failure to main-

11. The court's reaction to the record submitted in *Tenneco* is noteworthy:

It strains the Court's imagination to assume the administrative decision-makers reached their conclusion without reference to a variety of internal memoranda, guidelines, directives, and manuals, and without considering how arguments similar to Tenneco's were evaluated in prior decisions by the agency. DOE may not unilaterally determine what shall constitute the administrative record and thereby limit the scope of this Court's inquiry. *Id.* at 317.
*See also, Appalachian Power Co. v. EPA, supra,* 477 F.2d at 506–507.

12. This admission represents one of only two responses the agency has made to Plaintiff's discovery requests in this case.

13. The Remedial Order states:

Based upon the information available to FEA and after consideration of your written reply and the oral presentation of your representatives at the conference, FEA finds that violations of FEA regulations have occurred and are continuing to occur as described herein. A.R. at 28.

14. Exxon, however, has argued that the agency's request for a protective order, or in the alternative, for a stay of discovery pending disposition of Defendants' Motion for Summary Judgment is but another example of what Chief Judge Lord once referred to as this agency's "repeated, dilatory and unsuccessful attempts ... to block ... discovery by similarly situated plaintiffs. *See Gulf Oil Corp. v. Schlesinger,* 465 F.Supp. 913, at 915, n.1 (E.D.Pa., March 8, 1979).

tain and produce administrative records which are adequate for judicial review...." *Id.* at 1. Pertinent to this case, the Memorandum states that the administrative record of compliance and adjudicatory action should include "materials pertaining to" some or all of the following:

(i) the audit, the NOPV and the proposed RO, *from regional compliance office or OSC files*; (ii) finalization of the proposed RO, or, in older cases, the appeal of the RO, *from OHA files*; and (iii) in newer cases, the appeal of the RO, *from FERC* files. Exception records contain materials pertaining to (i) the exception decision and order, and in newer cases, the proposed exception decision and order, *from OHA files*; and (ii) the appeal decision and order, in older cases, *from OHA files*, or in newer cases, *from FERC files. Id.* at 4.[15]

The lack of factual materials pertaining to any of these actions in this Record indicates that the Record submitted does not even comply with the agency's own contents guidelines which were in effect when this Record was compiled.[16]

DOE nevertheless insists the Administrative Record is complete and that future discovery will lead to no other evidence which was before the "decision-maker" at the time the Remedial Order was issued. Defendant's Reply Memorandum at 8. Apparently this insistence stems in part from the DOE's belief that few facts are necessary to support the finding of a violation, and perhaps in part from the agency's current notion of what information a record should contain.

Addressing the latter issue first, DOE's repeated references to information considered by the "decision-maker" and its reliance on the ruling in *Quincy Oil Inc. v. FEA*, 468 F.Supp. 383 (D.Mass.1979) ("Quin-

cy") suggests the agency's lawyers have adopted a very narrow view of what constitutes a "full administrative record." Contrary to the position of the Patton Memorandum, it appears the DOE now interprets the term "administrative record" to include only the information which was before the single decision-maker who issued the "final order," that is, the information relied on by the Office of Hearings and Appeals or perhaps the Regional Administrator as well. This was the position taken in *Quincy.* There, the court held that because an NOPV and Remedial Order are not "final" agency decisions, the record filed for judicial review need not include "what was before other agency officials who made earlier, non-final decisions in the administrative process." *Id.,* at 387. Agency adoption of this view is reflected in its opposition to Exxon's Interrogatory 36(a), which requests information pertaining to the conference on the Notice of Probable Violation, in part on grounds that the conference was "an administrative procedure which occurred prior to the issuance of the Remedial Order and Decision and Order." *See* Defendants' Reply Memorandum at 9. This assessment of the agency's position, assuming its accuracy, might explain how the agency could certify the record as complete when it does not contain any materials pertinent to the agency audit or NOPV. Of course, it does not explain the failure to make Exxon's written submission a part of the record, despite the reference to it in both agency decisions.

The *Quincy* court's definition of the "administrative record" as only that information before the "final" decision-maker is an overly narrow, literal interpretation of *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 420, 91 S.Ct. at 825, where the Court spoke of "the full administrative record that was *before the*

---

**15.** For a functional description of the agency's compliance program, *see Coastal States Gas Corp. v. DOE,* 617 F.2d 854, 858–860 (D.C. Cir. 1980).

**16.** In an effort to refute Exxon's contention that this case precipitated the Patton Memorandum, the agency concedes the memoran-

dum was circulated three months prior to commencement of this suit and six months prior to compilation of the Administrative Record submitted to the Court. *See* Defendants' Memorandum in Reply to Plaintiff's Response to Defendants' Motion for a Protective Order at 8 (July 2, 1979).

*Secretary* at the time he made his decision." (emphasis added). The Court could not have meant to limit review only to evidence before *the* final decision-maker, as demonstrated by the broader holding that "[i]f additional explanation is necessary, 'reviewing courts' may require the *administrative officials who participated in [the agency] decision* to give testimony explaining their action." (emphasis added). *Id.* at 420–421, 91 S.Ct. at 825–826. However the Supreme Court's language should be construed, *Citizens to Preserve Overton Park* does not control a case such as this where an adjudicatory decision has been made.[17] *Citizens* involved review of informal agency action under the arbitrary and capricious standard and therefore only required a determination whether the decision was based on the relevant factors and was not clearly wrong. *Id.* at 416, 91 S.Ct. at 823. The Court was careful to emphasize that the secretary's decision was non-adjudicatory in nature, was not to be reviewed under the substantial evidence test, and that the administrative procedures employed were "not designed to produce a record that is to be the basis for agency action—the basic requirement for substantial evidence review." *Id.* at 414–415, 91 S.Ct. at 822–823. Moreover, since *Citizens*, the Court has rejected an analogous argument that the final agency decision is only that of the final reviewing authority, holding that decisions which have real operative effect absent appeal by a party are also to be deemed "final opinions." *See Renegotiation Bd. v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 186–87, 95 S.Ct. 1491, 1501–1502, 44 L.Ed.2d 57 (1975); *see also, Coastal States Gas Corp. v. DOE, supra*, 617 F.2d at 866–67.

■ Therefore, where an adjudicatory decision is to be reviewed under the substantial evidence standard, the court's duty is to evaluate the evidence underlying all operative decisions upon which the agency's final decision was based. *See, e. g., Universal Camera Corp. v. Labor Bd., supra*, 340 U.S. at 493, 71 S.Ct. at 467; *Appalachian Power Co. v. EPA, supra*, 477 F.2d at 507; *cf. Coastal States Gas Corp. v. DOE, supra*, 617 F.2d at 866–67. The relevant decisionmakers are those who participated in the making, or review of the agency decision. *Getty Oil Co. v. DOE*, No. 77–434, slip op. at 7 (D.Del., June 1, 1979). In this case, these would include the official(s) responsible for issuing the NOPV, as well as those responsible for drafting and approving the Remedial Order and OHA Decision. Section 557 of the APA provides analogous guidelines for the type of record generally required for substantial evidence review:

> The record shall show the ruling on each finding, conclusion or exception presented. *All decisions, including initial, recommended and tentative decisions are a part of the record. . . .*

90 Stat. 1246, 5 U.S.C. § 557. DOE has cited no decision besides *Quincy* narrowly restricting the concept of an administrative record to the evidence before the "final" decisionmaker.[18]

For the informal adjudicatory decision rendered here, as the Patton memorandum correctly advised, the agency was obligated to maintain records sufficient to permit substantial evidence review. It follows that, to the extent the agency's final decision was in fact based on a compendium of materials, documents, submissions, and initial staff decisions and opinions, these constitute the whole record in this case. The agency cannot redefine the record by compartmentalizing final decision-making as a predicate to omitting from the record all materials compiled by "the agency" before

---

17. An adjudicatory decision is one which "is judicial rather than legislative in nature, has an accusatory flavor and may result in some form of disciplinary action and is concerned with issues of fact under stated law." *Energy Consumers and Producers Ass'n v. DOE*, 632 F.2d 129, 140 (Em.App.1980) *quoting American Express Co. v. United States*, 472 F.2d 1050, 1055, 60 CCPA 86 (1973).

18. DOE concedes that the Supreme Court has not ruled definitively as to the composition of an administrative record. Defendants' Reply Memorandum at 8. *See also*, 2K. Davis, Administrative Law Treatise, 2d ed., Supp.1980 at 294–302.

rendering the final decision. Otherwise stated, the focus of inquiry into record definition is how the agency actually functions in its decision-making, not the labels attached to the stages of its decisional processes.

DOE also opposes discovery on grounds that the findings in the Remedial Order follow from facts uncontroverted by Exxon, thus obviating any need for additional discovery to enable Exxon to respond to DOE's Motion for Summary Judgment. DOE asserts the only findings made were that Exxon was subject to the price regulations, had discontinued its practice of accepting Bankcards which had been in effect on the base date, and had not sought or received prior agency approval before terminating the program. The agency claims these findings alone support the "conclusions" of law that Exxon modified its normal business practices so as to circumvent the price rules, imposed more stringent credit terms, and obtained a higher price by failing to provide the same services previously sold, in violation of 10 C.F.R. §§ 210.-62(a), (c). *See* A.R. at 034–35.

Exxon maintains the agency made other "findings" which are material to the agency decision and which require, but are not supported by, substantial evidence or any evidence at all. These include a number of statements which appear in the "Analysis" section of the Remedial Order and in various parts of the OHA Decision. The findings Exxon claims are material and disputed are emphasized below:

*Remedial Order*:

Exxon's action of discontinuing these particular credit card services (e. g., Master Charge and Bank Americard) had a *detrimental impact on purchasers of covered products* from Exxon. First, independent retailers who feared a loss in business, had to make their own arrangements under the bank credit card systems, and incur all costs associated therewith, in order to continue accepting these credit cards from ultimate consumers. Second, the remaining independent retailers who actually stopped accepting the

bank credit cards, because Exxon no longer accepted them, *were subject to losing business from those ultimate consumers who carried the bank credit cards.* Third, the ultimate consumers of Exxon products suffered a reduction in their credit buying power. A.R. at 31.

*Decision and Order*:

It is, of course, extremely difficult to accurately and precisely measure the effects of the discontinuance of the bank credit card program upon consumers and individual Exxon retailers. However, as the FEA noted in the Remedial Order which it issued, Exxon's termination of its bank credit card services *adversely affected its retailers and consumers in a number of general ways. Any independent retailer of Exxon products which desired to continue accepting the bank cards was required to make its own arrangements with the banks* and to incur the additional costs that are associated with the extension of these services by the banks. The independent retailers that decided not to make individual arrangements for the cards *faced the possibility that they would lose business from ultimate consumers* who desired to pay for their purchases with Master Charge and Bank Americard. Even if Exxon were correct in its contention that the withdrawal of the bank cards did not reduce the total volume of Exxon's retail credit sales of motor gasoline, it would not lead to the conclusion that no Exxon retailer had been adversely affected by the termination of the bank card program. Exxon has provided data which indicates the relative percentage of its retail gasoline sales that were made using the Exxon credit cards and using the bank cards during the calendar years 1974 through 1976. However, that material is indicative only of Exxon's activities on a nationwide basis. *Exxon has not shown that this data provides an accurate representation of the volume of bank credit card sales in all regions of the country or with respect to the individual retailers.* Indeed, Exxon retailers in certain areas of the United States either

*may have achieved a significant volume of additional sales as a result of the bank cards or the bank cards may have enabled them to maintain their sales positions with respect to competitors who offered bank cards.*

In addition, Exxon's contention that its termination of the bank credit card program did not eliminate a payment option for its retail customers must also be rejected. *Exxon has not demonstrated that those consumers who held Master Charge or Bank Americard credit cards also held Exxon credit cards* and would therefore be able to continue to purchase covered products on a credit basis after the termination. Exxon also states that those consumers who held the bank cards would not be deprived of credit since they are likely to qualify for an Exxon card. Exxon fails to note that by discontinuing the bank cards, Exxon limited the variety of credit terms which had been available to consumers, and it compelled consumers who wished to purchase Exxon products on credit to apply for an Exxon card if they did not already have one. *Furthermore, Exxon did not and does not now know whether every bank credit card holder would be entitled to an Exxon card,* nor has Exxon agreed to compensate consumers for the *inconvenience and expense involved* in acquiring and using the Exxon card instead of one of the bank cards.

\*     \*     \*     \*     \*     \*

Exxon states that when it instituted the bank credit card arrangements in 1970 it intended to continue those arrangements only so long as the following conditions were met: the bank charge did not exceed three percent; at least 10 percent of total retail sales were made with the use of the bank cards; and one-third of the bank card sales would be incremental sales, *i. e.* sales that otherwise would not have been made. According to Exxon, it reviewed its bank card program during the year 1974 and found that bank charges had risen above three percent, that bank card sales represented only two percent of all of its retail sales of motor gasoline and that the bank card program had attracted few, if any, incremental sales. Exxon states that on the basis of these findings it decided to discontinue the bank card arrangements.

\*     \*     \*     \*     \*     \*

Even if we accept Exxon's argument that the FEA Regulations permit a supplier to alter its credit practices so long as it does so on the basis of non-discriminatory factors which were in effect in the base period, it does not appear that the particular considerations described above should be used in evaluating the propriety of Exxon's change in its credit practices. On the one hand, *Exxon has failed to submit any documentary material which convincingly demonstrates that at the time it adopted the bank card program it had actually identified these considerations as the factors which would govern the continuation of the program.* On the other hand, the particular goals for the bank card program which Exxon has characterized as base period factors *appear to be mere business expectations which relate to ultimate success of the program as a whole rather than actual conditions which Exxon had established as an integral part of the program.* AR at 114–115.

\*     \*     \*     \*     \*     \*

Moreover, although the replacement of the bank cards by the Exxon card may alleviate some of the burdens and inconvenience which Exxon consumers and retailers experienced when Exxon discontinued the bank card program, *the Exxon card is not an adequate substitute. See supra* pp. 3, 4. AR at 121.

Exxon argues the underlined statements are disputed "material" findings whose factual predicate has not been disclosed. Without discovery of record evidence which might controvert these findings, Exxon urges, it will be prejudiced in its ability to respond to the legal question whether substantial evidence supports the agency's findings.

Exxon is entitled to an opportunity to discover the evidentiary basis, if any, for the findings highlighted above before DOE's Motion for Summary Judgment is decided. While the agency characterizes the findings as "common-sense conclusions," they are not the ultimate legal conclusions upon which the decision is based.[19] Rather, they are intermediate findings which are essential to the ultimate conclusion that Exxon violated the base price rule by failing to maintain normal business practices, by imposing more stringent credit terms on retailers and consumers and by failing to provide the same services previously sold without prior agency approval. For example, the statements that Exxon's projections of Bankcard cost and use were "mere business expectations" rather than "factors" governing continuation of the program, are plainly findings of fact not now supported by Record evidence. Before responding to DOE's Motion for Summary Judgment, Exxon may discover whether the agency considered any materials not now in the record when making these findings, and the nature of such materials, if any.[20]

There is another reason why the Court must deny DOE's request that discovery be stayed pending resolution of its Motion for Summary Judgment. In addition to determining whether the findings are supported by substantial evidence in the Record, the law requires that this Court inquire into the reasonableness of the agency's conclusions.

See *Cities Service Co. v. FEA*, 529 F.2d 1016, 1024 (Em.App.1975), *cert. denied* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976). To make that inquiry, the Court must have more than the agency's intuitive conclusions, it must have access to the full record upon which the conclusions were based. *See, e. g. Mobil Oil Corp. v. FPC, supra,* 483 F.2d at 1260; *Appalachian Power Co. v. EPA, supra,* 477 F.2d at 506–07; *Chicago v. FPC,* 458 F.2d 731, 744–45 (D.C. Cir. 1971) *cert. denied* 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972). Succinctly put, to require less denies effective judicial review, and leaves the agency unaccountable, contrary to congressional purpose. It would be a hypocritical scheme indeed to hand to a decision-maker the power to control review of its decision. DOE may not unilaterally restrict the Court's inquiry on summary judgment solely to the orders of the agency itself.[21] *Appalachian Power Co. v. EPA, Id.* Therefore, the agency's motion is premature until such time as the Court is satisfied the "full" record has been submitted. *See, e. g. Mobil Oil Corp. v. FPC, supra,* 483 F.2d at 1259, 1260 n.78.

■ In sum, Exxon may engage in discovery necessary to complete the Administrative Record in this case before DOE's Motion for Summary Judgment is entertained. Should it appear after discovery that the agency failed to discharge its obli-

**19.** The Administrator's legal conclusions are contained in Section D of the RO labelled "Conclusions of Law."

**20.** Without deciding the merits of Exxon's claim that the RO is not supported by substantial evidence, it should be noted that "factual inferences," when used in adjudicating a particular set of disputed facts, might not meet the requirement that administrative findings have a substantial evidentiary basis. *See Mobil Oil Corp. v. FPC,* 483 F.2d 1238, 1260 (D.C. Cir. 1973) *interpreting United States v. Florida East Coast Railway,* 410 U.S. 224, 246, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973). *But see, Atlantic Richfield Co. v. FEA,* 556 F.2d 542, 548 (Em. App.1977).

**21.** As the Fourth Circuit Court of Appeals stated when furnished an insufficient record in *Appalachian Power Co.*:

[W]hen this Court reviews the action of the Administrator, it does not confine itself to the order of the Administrator or to the bare language of the state plan, nor will it seek to determine from the four corners of those two documents whether the action taken was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." If judicial review were to be tethered to these abbreviated documents, it would "almost inevitably become a meaningless gesture" and would be reduced to "a game of blind mans bluff." . . . And in making its review, the Court must have, not merely that full articulation of the agency's reasoning, but it must also have "the whole record" on which the agency acted. . . . [citations omitted].

gation to develop an adequate factual predicate for its decision, or that the Court is unable to evaluate the decision due to deficiencies in the record, Exxon may then apply for an order of remand.

II. *Whether Discovery is Needed for Contemporaneous Construction.*

■ Exxon claims DOE acted arbitrarily, capriciously and without authority in applying the "Normal Business Practices" regulation to Exxon's termination of its Bankcard program. Specifically, Exxon contends that the Remedial Order is contrary to the intent of the drafters of § 210.62 and the statutes pursuant to which that regulation was promulgated, and that DOE unreasonably read the final sentence of § 210.-62(a) containing the "more stringent credit term provision" in isolation from the regulation as a whole, thereby altering its intended meaning. As part of its multipronged attack on the Remedial Order, Exxon also takes the position that DOE lacked authority to regulate credit terms or general financing arrangements *except* where reasonably necessary to regulate the pricing of petroleum products in accordance with the powers expressly granted the agency. *See Marathon Oil Co. v. FEA,* 547 F.2d 1140, 1145–47 (Em.App.1976) *cert. denied* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 378 (1977). Exxon requests contemporaneous construction discovery to support its position. To date, its efforts to obtain contemporaneous construction evidence from the agency have been unsuccessful.

In related cases, DOE and its predecessors have repeatedly sought to limit discovery of the agency's contemporaneous construction of its regulations. The strategy has met with only limited success. Though the courts are not unanimous, most reject confining judicial review of agency interpretations to the administrative record and approve contemporaneous construction discovery in some form. *Compare, Standard Oil Co. v. DOE,* 596 F.2d 1029 (Em. App.1978); *Pasco Inc. v. FEA,* 525 F.2d 1391 (Em.App.1975); *Exxon Corp. v. DOE,* No. CA3–77–1158–W (N.D.Tex., June 7,

1979); *Tenneco v. DOE,* 475 F.Supp. 299 (D.Del.1979); *Petrolane Inc. v. DOE,* 79 F.R.D. 115 (C.D.Cal.1978); *Gulf Oil Corp. v. Schlesinger,* 465 F.Supp. 913 (E.D.Pa.1979) *with Pennzoil Co. v. DOE,* 514 F.Supp. 516 (D.Del., Jan. 29, 1981); *Getty Oil Co. v. DOE,* No. 77–4533 (C.D.Cal., May 12, 1978).

According to TECA, when inquiring whether an interpretive position is arbitrary and capricious, the weight to be given an agency's interpretation of its own regulations "depends upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all of those factors which give it power to persuade, if lacking power to control." *Standard Oil Co. v. DOE,* 596 F.2d 1029, 1056 (Em.App. 1978), *quoting Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *see also, Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *California Molasses Co. v. California & Hawaiian Sugar Co.,* 551 F.2d 1230, 1232 (Em.App.1977); *Tobin v. Edward S. Wagner Co.,* 187 F.2d 977, 979 (2nd Cir. 1951). In reviewing the agency's interpretation of a regulation in the *Standard Oil* case, TECA focused upon evidence obtained in discovery—evidence demonstrating how agency personnel interpreted the regulation in dispute. The progeny of *Standard Oil* have followed suit in a plethora of discovery orders. *See Cotton Petroleum Corp. v. Duncan,* No. 79–C–217–BT, slip op. at 10, n.9 (N.D.Okl.1980) (cases cited therein).

DOE argues contemporaneous construction discovery is only permitted when the regulation is ambiguous on its face, and that 10 C.F.R. § 210.62 is a model of clarity. In support of DOE's position, a number of courts have noted inherent ambiguity in the regulation as a reason for ordering discovery, *see Standard Oil Co. v. DOE, supra,* 596 F.2d at 1055; *Cotton Petroleum Corp. v. Duncan, supra,* slip op. at 4; *Tenneco Oil Co. v. DOE, supra,* 475 F.Supp. at 318. But none has held that statutory ambiguity is a condition precedent to contemporaneous

construction discovery. It is unnecessary to decide this question, however, because Exxon has made a substantial allegation of ambiguity which this Court finds sufficient to justify contemporaneous construction discovery in this case.

Exxon correctly points out that the terms "normal business practice" and "more stringent credit terms" lack a fixed meaning and are not defined in the statute. *See* 10 C.F.R. § 210.62(a). Also, the phrase "terms or conditions not customarily imposed upon the sale of an allocated product" arguably is susceptible to differing interpretations. Whether these terms could reasonably have been intended to apply to a credit card program is not clear from the regulation. In addition, Exxon has furnished several exhibits demonstrating prior equivocal interpretation of these regulations by agency personnel.[22] *See* Plaintiff's Exh's 1–3, 5, submitted at October 15, 1980 pre-trial hearing held in chambers before Judge Buchmeyer.

Together, the record and extra-record ambiguities indicate that there could be differing views within the agency on the meaning of 10 C.F.R. § 210.62. Because the regulation does not compel the conclusion that Exxon's termination of Bankcards was a violation of the price rules, the Court must examine DOE's contemporaneous construction of 10 C.F.R. § 210.62, as well as Ruling 1974–10 for interpretive guidance. *See, e. g. Bowles v. Seminole Rock & Sand Co., supra*, 325 U.S. at 414, 65 S.Ct. at 1217; *McCulloch Gas Processing Corp. v. DOE, supra*, at 1224. Moreover, absence of contemporaneous construction of the Normal Business Practices regulations makes more difficult the Court's task of evaluating the reasonableness of DOE's conclusion that Exxon transgressed the regulations merely by discontinuing its Bankcard program without prior agency approval. *See* A.R. at 41. But this only opens the door to a subset of questions.

Determining the proper scope of contemporaneous construction discovery, both substantive and temporal, implicates conflicting valid interests. Discovery of intraagency interpretations and opinions runs head up against the executive privilege which protects the agency's deliberative processes. *See Coastal States Gas Corp. v. DOE, supra* 617 F.2d at 866–871. And though the question of privilege can best be resolved with reference to specific documents after discovery has commenced, some courts have looked to the basic policies underlying the privilege—protection of tentative, pre-decisional agency opinions—as a referent for determining which agency interpretations should be deemed "relevant" for purposes of discovery. Not surprisingly, courts have drawn their lines at differing places.

In *Standard Oil Co. v. DOE, supra*, TECA rejected the agency's argument, advanced again in this case, that the only relevant interpretations are those published or otherwise formally adopted by the agency, its General Counsel, his staff, and other "high level policy makers." Rather, the court found significant the interpretations of personnel charged with enforcing the regulation, including statements and actions of FEA auditors and other lower level officials. *Id.* at 1056. This view finds support in *Udall v. Tallman, supra*, 380 U.S. at 6–7, 18, 85 S.Ct. 796–797, 802 and has been widely accepted. *See, e. g. Exxon Corp. v. DOE, supra*, slip op. at 6; *Tenneco Oil Co. v. DOE, supra*, 475 F.Supp. at 318; *Amoco Production Co. v. DOE, supra*, at 818; *Petrolane Inc. v. DOE, supra*, 79 F.R.D. at 118–119; *Phillips Petroleum Co. v. DOE, supra*, 449 F.Supp. at 784–85; *Standard Oil Co. v. DOE, supra; but see, Pennzoil Co. v. DOE*, No. 78–335, (D.Del., Jan. 29, 1981)

---

**22.** Exxon notes that, as originally promulgated, the normal business practices regulation prohibited only the imposition of *"discriminatively more stringent credit terms."* (emphasis added). 38 Fed.Reg. 744, 748–49 (January 2, 1974) adopting verbatim proposed section 200.14, 38 Fed.Ref. 34414, 34417 (December 13, 1973) (originally § 200.14). Evidence concerning the decision to omit the term "discriminative," Exxon reasons, may bear significantly on the intent and original interpretation of the regulation as well as the validity of the meaning attributed to 10 C.F.R. § 210.62 in Ruling 1974–10.

(rejecting as privileged all "tentative" views). The fact that preliminary or lower level opinions may be rejected by upper-level decision-makers goes to the weight, rather than the discoverability, of such interpretations.[23] The Court finds this argument persuasive in favor of discovery.

Discoverable interpretations include "statements, internal memoranda, manuals, directives and the like," *see Petrolane Inc. v. DOE, supra,* 79 F.R.D. at 119; *Phillips Petroleum Co. v. FEA, supra,* 449 F.Supp. at 784–85, as well as agency applications of the regulation(s) which reflect a particular interpretation. *See, e. g., Amoco Production Co. v. DOE, supra,* at 818; *Phillips Petroleum Co. v. DOE, supra,* 449 F.Supp. at 784–85; *United States v. Roddey Packing Co.,* 121 F.Supp. 241, 243 (E.D.S.C.1954).

Consistent with this rule, discovery can reasonably be tailored to minimize DOE's burden of search.[24] And because our approach is one of balancing rather than categorization, there is a point of diminishing relevance where the likelihood of aid in the interpretive task no longer justifies discovery. As the Court is only interested in comparing the interpretations and actions of the agency at other times in order to decide what weight to give the interpretation given here, Exxon may not discover the "administrative record"—the evidence and decisional processes—underpinning each contemporaneous interpretation. *See Amoco Production Co. v. DOE, supra,* at

819–821. Similarly, Exxon's request for production of "all oral communications" relating to the development, interpretation, and enforcement of 10 C.F.R. § 210.62 and Ruling 1974–10 would yield much information of little relevance while requiring an extensive search. That request, therefore, is unreasonably burdensome. *See, e. g., Getty Oil Co. v. DOE,* No. 77–434, slip op. at 5 (D.Del.1979). It follows that Exxon must narrow its request to specific persons or specific conversations.

Turning to the temporal limitations, DOE's request that contemporaneous construction discovery, if granted, be limited to a one-year period is denied. The one-year limitation in *Phillips Petroleum Co. v. DOE, supra,* was adopted because the challenged regulation was in force for only one year. *See also Amoco Production Co. v. DOE, supra,* slip op. at 8. The relevant period for discovery here would date from August 6, 1973 when the Cost of Living Council issued its Phase IV Petroleum Price Regulations, 38 Fed.Reg. 21592, 21598 (Aug. 9, 1973) to October 2, 1978, the date the OHA issued its final Decision and Order in this case.[25] This represents the period during which the "credit terms" and "normal business practices" regulations, or forerunners thereof, were in effect and subject to conflicting interpretations within the agency. *See, e. g. Mobley v. DOE,* No. 78–1073, slip op. at 5–6 (W.D.La. December 15, 1980).

**23.** In *Getty Oil v. DOE,* 1 Eng.Mgmt. (CCH) ¶ 9741 at 9893 (D.Del.1978), the court elaborated on the distinction between permissible consideration of contemporaneous construction evidence and forbidden *de novo* review:

Nor does the Court's conclusion with respect to merits discovery foreclose discovery soliciting contemporaneous constructions of the regulations by agency personnel. As I view it contemporaneous constructions are not adjudicatory facts. They are analogous to legislative history and are designed to aid the Court in deciding questions of law. Considerations of such agency interpretations do not constitute *de novo* review. It may be, as the DOE urges, that the only contemporaneous constructions worthy of weight are formally published rulings of that agency, qua agency. But this possibility should not bar

full development of the facts through discovery.

**24.** DOE's blanket opposition to discovery on grounds of undue burden, hardship and expense is a conclusory assertion to which the court cannot give weight. If the agency objects on these grounds, it must make a specific showing of undue burden with respect to particular discovery requests. *See, e. g., Wirtz v. Capitol Air Service, Inc.,* 42 F.R.D. 641, 643 (D.Kan.1967); 4A *Moore's Federal Practice* ¶ 33.20 at 33–113 (2d ed. 1978).

**25.** DOE concedes that the Mandatory Petroleum Allocation and Price regulations at issue here incorporated, without substantive change, the CLC's Phase IV Petroleum Price Regulations. *See* Defendants' Supplemental Brief at 8.

Finally, DOE's blanket refusal to produce contemporaneous construction evidence on grounds of deliberative process or "executive" privilege must be rejected. At this juncture, the claim is both premature and improperly raised.

■ The law regarding assertion of deliberative process privilege has been spun out on numerous occasions and need only be summarized here. As noted, those policies supporting the privilege must be balanced by the Court's obligation to truthseeking and full disclosure, keeping in mind that the deliberative process privilege is a qualified privilege, to be applied as narrowly as possible, consistent with efficient administrative operations. *See Coastal States Gas Corp. v. DOE, supra,* 617 F.2d at 868; *In re Stripper Well Litigation, supra,* slip op. at 12. It is the agency's burden to substantiate its claim of privilege by establishing that the communications requested were tentative recommendations or opinions without precedential significance or operative effect. *Coastal States Gas Corp. v. DOE, id.* at 866–67.

■ It is now firmly established that a claim of executive privilege will only be considered if raised with reference to specific documents or specific deposition questions. *See Coastal States Gas Corp. v. DOE, supra,* 617 F.2d at 866; *In re Stripper Well Litigation, supra,* slip op. at 14; *Amoco Production Co. v. DOE, supra,* slip op. at 5; *Tenneco Oil Co. v. DOE, supra,* 475 F.Supp. at 319. Identification of particular documents and designation of the information claimed to be privileged enables the Court to evaluate whether the materials reveal tentative deliberations and, if so, to balance on an *ad hoc* basis, the individuals need for the material against the injury to the Government's consultative processes caused by disclosure. The test is whether the material is "so candid or personal in nature that public disclosure is likely in the future to stifle honest and frank communication within the agency." *Coastal States Gas Corp. v. DOE, supra,* 617 F.2d at 866. Because the outcome is dependent upon the individual document considered and the role

it plays in the administrative process, any blanket assertion of privilege must summarily be rejected. *Id.* at 867; *Thill Securities Corp. v. New York Stock Exchange,* 57 F.R.D. 133, 138 (E.D.Wis.1972).

■ Further to protect against abuse of its executive privilege, the agency must follow established procedural formalities for invoking it. Only the agency head may assert the privilege after that officer's personal consideration of the matter. *United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 531–532, 97 L.Ed. 727 (1953); *Association for Women in Science v. Califano,* 566 F.2d 339, 347 (D.C.Cir.1977); *City Nat'l Bank of Sylacauga v. St. Paul Fire & Marine Ins. Co.,* 408 F.2d 371, 372 (5th Cir. 1969); *In re Stripper Well Litigation, supra,* slip op. at 13; *Amoco Production Co. v. DOE, supra,* at 821. The affirmations of staff attorneys, especially those participating in pending litigation are legally insufficient. As reasoned in *Pierson v. United States,* 428 F.Supp. 384, 395 (D.Del.1977):

> Executive privilege permits only one branch of government to ban disclosure of documents ordinarily discoverable and as such it is 'a phase of release from requirements common to private citizens or organizations.' *Kaiser Aluminum & Chemical Co. v. United States, supra,* 157 F.Supp. [939] at 944 [141 Ct.Cl. 38]. Thus, the privilege should be invoked with consistency and only after careful consideration.... To permit any government attorney to assert the privilege would derogate both of those interests. It would be extremely difficult to develop a consistent policy of claiming the privilege. Moreover, the judgment of attorneys engaged in litigation is very likely to be affected by their interest in the outcome of the case.... It is of the greatest importance that the privilege be invoked only when policies it seeks to encourage are seriously threatened. Requiring the agency head to review the documents sought and to claim the privilege where appropriate is the most effective method available to assure consistency and prudence.

The agency head need not personally inspect each document, so long as he establishes case-specific content guidelines which will insure appropriate and consistent invocation of the privilege by the agency. *See In re Stripper Well Litigation, supra,* slip op. at 13; *Amoco Production Co. v. DOE, supra,* at 821, n.16.

None of the three requirements for asserting executive privilege has been complied with in this case. The agency has not designated with particularity those materials alleged to be privileged. It has not articulated precise reasons why the public interest would be affected adversely by disclosure. And, no affidavit or other statement has been submitted by the Secretary of the Department of Energy demonstrating that he has reviewed the question of privilege and believes that disclosure of the materials sought would genuinely threaten the public interest or efficient agency operations. Until such time as the privilege properly has been invoked, the Court will not address the merits of the agency's privilege claims.

III. *Whether Discovery is Needed to Test the Procedural Validity of the Agency's Regulations.*

Exxon has mounted a procedural attack on each of the regulations applied by the Regional Administrator and the Office of Hearings and Appeals. For purposes of discovery, however, only two challenges appear relevant; (1) that 10 C.F.R. § 210.62(c) was not promulgated in accordance with the notice and comment requirements of Section 4 of the Administrative Procedure Act, 5 U.S.C. § 553, and (2) that if Ruling 1974–10 was a substantive rule, it was invalidly published in final form without the opportunity for notice and comment required by the APA. Exxon has served interrogatories calculated to produce information relevant to the merits of its position on these claims.

As a first ground for opposing discovery, DOE urges the procedural validity of these regulations is not before the Court because Exxon neglected to raise these issues in its Complaint or Answer to the agency's counterclaim. This argument misses the point that Exxon's procedural challenge relates back to its overall claim that the agency lacked statutory authority to issue the Remedial Order. Under Fed.R. Civ.P. 15(c), Exxon would thus be entitled to amend its Complaint to add its procedural claims. To avoid further prolonging this lawsuit through amendment and piecemeal resolution of discovery issues, the Court will assume that amendment will be forthcoming and will treat the Complaint as if amended.

DOE further objects to procedural discovery on grounds that Exxon failed to exhaust its administrative remedies by requesting a formal adjudicatory hearing on validity of the regulations before submitting the matter for judicial determination. Exxon, however, styles its procedural claims as "constitutional issues," and argues constitutional challenges need not be raised in administrative proceedings, *citing Califano v. Sanders,* 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977); *Mathews v. Eldridge,* 424 U.S. 319, 330, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976). Neither of these positions is entirely persuasive.

The agency's objection raises issues of "waiver" of claims and "primary agency jurisdiction," rather than failure to exhaust administrative remedies. *See Touche Ross & Co. v. SEC,* 609 F.2d 570, 574–76 (2d Cir. 1979). The exhaustion doctrine is concerned mainly with the timing of judicial review. Requiring exhaustion before judicial review provides the agency an opportunity to develop factual findings, to apply its expertise to new issues, and to exercise its discretionary powers. *Id.* at 574. That doctrine may not be appropriate here where Exxon pursued its statutory remedies by timely appealing the Remedial Order to the Office of Hearings and Appeals before seeking judicial review. DOE has cited no statutory requirement that Exxon request an additional, formal adjudicatory hearing regarding the validity of agency regulations, nor has the agency proved that such a proceeding would have been provided if requested. Thus, the primary purpose served

by the exhaustion doctrine—preventing premature interference with agency processes by the judiciary—is not disserved here where available agency procedures have been pursued. *See, e. g., Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975); *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969).

Nevertheless, it is generally recognized that courts will not review objections to an agency's procedures or decisions not raised at the administrative level. *United States v. L. A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952); *Board of Education v. Harris,* 622 F.2d 599, 606 (2d Cir. 1979) *cert. denied* —— U.S. ——, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981); *Cisternas-Estay v. Immigration and Naturalization Service,* 531 F.2d 155, 160 (3rd Cir.) *cert. denied* 429 U.S. 853, 97 S.Ct. 145, 50 L.Ed.2d 127 (1976); *Beatrice Foods Co. v. FTC,* 540 F.2d 303, 313, n.8 (7th Cir. 1976). The rationale for this rule was expressed in *United States v. L. A. Tucker Truck Lines, Inc., supra,* 344 U.S. at 37, 73 S.Ct. at 69:

> Simple fairness to those engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only erred but has erred against objection made at the time appropriate under its practice.

Application of the "waiver" rule protects the integrity of the administrative process and prevents litigants from deliberately bypassing available agency procedures. *Touche Ross & Co. v. SEC, supra,* 609 F.2d at 574. Orderly procedure, fairness and promotion of agency administrative re-examination requires that administrative bodies be provided an opportunity to correct procedural errors and exercise their discretion before judicial review proceedings are initiated.

Consistent with these policies, the waiver concept is strictly applied where the claim not raised below challenges the procedures employed by the administrative tribunal or presents new factual claims. For example

in *United States v. L. A. Tucker Truck Lines, supra,* the Court held it was error to entertain appellee's claim that an ICC hearing examiner had not been appointed pursuant to APA § 11 where such challenge was not lodged during the commission proceedings. Indeed, of those on point, all the decisions relied on by the agency to oppose this Court's consideration of Exxon's procedural claims involved refusals to consider newly raised attacks on the manner in which the agency proceeded or new evidentiary claims. *See,* Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment at 37, n.17 (cases cited therein). *See also, e. g., Cisternas-Estay v. Immigration and Naturalization Service, supra,* 531 F.2d at 160 (refusal to consider new claim that immigration judge failed to account for U.N. Protocol on refugees); *Beatrice Foods Co. v. FTC, supra,* 540 F.2d at 313, n.8 (refusal to consider new claim that A.L.J. wrongfully prohibited examination of certain witnesses); *Doyle v. United States,* 599 F.2d 984, 1000–01 (Ct.Cl. 1979) (claim that remedy inadequate to achieve its stated purposes barred by previous failure to object to remedy).

The waiver rule, however, appears sufficiently flexible to permit a reviewing court to consider certain questions of law not pressed or passed upon below. *Hormel v. Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941); *Board of Education v. Harris, supra,* 622 F.2d at 606–07; *Tenneco Oil Co. v. DOE, supra,* 475 F.Supp. at 309. Whether the agency should be given the first opportunity to adjudicate a question concerning promulgation of its regulations is an issue of "primary agency jurisdiction" involving the "proper relationships between the courts and administrative agencys charged with particular regulatory duties." *See Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 303, 96 S.Ct. 1978, 1986, 48 L.Ed.2d 643 (1976); *Board of Education v. Harris, id.* As the Second Circuit noted in *Harris,* "[t]he exercise of the court's discretion is guided in this situation by a desire for uniformity of regulation and the need for initial consideration by a body possessing special expertise in the issue

presented." *Citing U. S. Tour Operators Ass'n v. Trans World Airlines, Inc.*, 556 F.2d 126, 130 (2d Cir. 1977). Thus, it is well established that courts need not abjure consideration of purely legal issues involving neither the agency's specialized expertise nor its fact finding abilities. *Id.* at 607; *Weyerhauser Co. v. Marshall*, 592 F.2d 373, 376 (7th Cir. 1979); *FTC v. Feldman*, 532 F.2d 1092, 1096 (7th Cir. 1976). This is also true in the analogous area of exhaustion of administrative remedies where the Supreme Court has twice stated that constitutional objections to agency action need not be raised at the administrative level. *See Califano v. Sanders, supra; Mathews v. Eldridge, supra.*

Exxon's procedural attack on DOE's regulations does not raise a constitutional claim,[26] but rather questions the agency's compliance with the Administrative Procedure Act when it promulgated 10 C.F.R. § 210.62(c) and Ruling 1974–10. Yet, the reasons supporting the exception to the exhaustion requirement for constitutional claims tend to support an exception to the waiver requirement for the claims raised by Exxon. The question presented is a strictly legal one involving APA compliance. It is not one upon which the agency has specialized expertise or one which the agency is peculiarly competent to decide. Neither would development by the agency of a factual record facilitate resolution of Exxon's claim. Finally, the agency, by its briefs in this case, has stated its position that notice and comment were not required prior to promulgating 10 C.F.R. § 210.62(c) and Ruling 1974–10. Courts need not bow to the primary jurisdiction of the agency where there is clear indication that its consideration of new claims would not alter the result. *See, e. g. Board of Education v. Harris, supra*, 622 F.2d at 607; *Porter County Chapter of the Izaak Walton League of America, Inc. v. Costle*, 571 F.2d

359, 363–64 (7th Cir.) *cert. denied*, 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 130 (1978); *ICC v. Maine Central R. Co.*, 505 F.2d 590, 594 (2d Cir. 1974).

Alternatively, DOE requests discovery be denied because 10 C.F.R. § 210.62(c) is merely a recodification of validly promulgated regulations and because Ruling 1974–10 is an interpretative rule. These arguments are premature because they go to the ultimate merits of Exxon's claim of procedural invalidity. Indeed, Exxon's Interrogatories Nos. 15–25 are intended specifically to discover evidence bearing on these questions. As the agency has already collated information concerning the procedural validity of these regulations, responding to Exxon's requests will not be unduly burdensome.

Under these circumstances, the Court exercises its discretion to permit discovery relevant to the agency's promulgation of 10 C.F.R. § 210.62(c) and Ruling 1974–10. Should Exxon desire to pursue its claims of procedural invalidity after discovery is completed, the Court will reconsider whether the claim is barred for Exxon's failure to exhaust its administrative remedies, if requested to do so.

IV. *Conclusion.*

Exxon has prevailed on its claim that discovery should be allowed before consideration of DOE's Motion for Summary Judgment. Consequently, DOE's Motion for a Protective Order is DENIED, and Exxon's Motion to Compel discovery is GRANTED. Nevertheless, consistent with the limited purposes for discovery identified in this Memorandum Order, Exxon shall narrow its interrogatories to include only plainly relevant materials.[27] The parties will be expected to confer about narrowing discovery in accordance with the guidelines set forth in this Order.

---

**26.** Exxon has raised constitutional objections to the manner in which DOE conducted its proceedings, but these are not currently subjects of this discovery dispute.

**27.** For example, Exxon's requests that the agency identify "each person who participated

in any manner in the promulgation" of regulations and designate "all documents and oral communications of any kind" with regards to particular matters, are overbroad. *See e. g.* Interrogatories Nos. 1, 2, 7, etc. . . .